**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-3028-LTB-NYW

MARK D. REMALY, an individual,

Plaintiff,

v.

WYNDHAM RESORT DEVELOPMENT CORPORATION
d/b/a Worldmark by Wyndham, an Oregon Corporation

Defendants.

---

**MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION**

Plaintiff Mark Remaly's ("Plaintiff") claim against Defendant Wyndham Resort Development Corporation d/b/a Worldmark by Wyndham ("Wyndham") for alleged violations of the Fair Credit Reporting Act ("FCRA"), specifically 15 U.S.C. § 1681s-2, is at its core a contract dispute, not an FCRA claim. This is because Plaintiff's claim that Wyndham engaged in inaccurate credit reporting and failed to conduct reasonable investigations in response to his credit disputes is based solely on his dispute over the validity of his timeshare contract with Wyndham. Wyndham maintains, as it always has, that Plaintiff's original timeshare contract was reinstated after Plaintiff rescinded the rewritten contract that was intended to correct deficiencies that Plaintiff claimed were in the original contract. Wyndham's credit reporting was consistent with its internal records, and therefore cannot be the basis for an FCRA claim. Plaintiff has not made a claim to challenge the validity of his contract.

Even if Plaintiff stated a proper FCRA claim against Wyndham, he has failed to provide evidence of any compensable injury aside from his own uncorroborated testimony. Plaintiff admits that he never suffered any adverse action on a credit application as a result of Wyndham's credit reporting. As a matter of law, Plaintiff cannot recover damages under the FCRA for his decision to remove himself from the mortgage market. Further, there is no evidence supporting Plaintiff's claimed emotional distress and loss of quality of life aside from his own testimony. Neither of Plaintiff's proffered expert witnesses has provided an opinion that Plaintiff actually suffered the injuries he claims, and Plaintiff's own healthcare records directly contradict his claim that Wyndham caused his emotional distress. In the absence of any compensable injury resulting from Wyndham's credit reporting, Plaintiff's FCRA claim must fail.

For all of these reasons, Wyndham is entitled to summary judgment on Plaintiff's FCRA claim against it.

## STATEMENT OF UNDISPUTED FACTS

On October 12, 2017, Mr. Remaly purchased a Worldmark by Wyndham ("WBW") ownership from Wyndham, consisting of 10,000 Vacation Credits (contract number 001361701014) (the "Original Contract"). (Declaration of Andrew C. Gresik ("Gresik Decl.") ¶ 2, Ex. A, Transcript of the Deposition of Mark D. Remaly ("Remaly Dep.") 13:9–16:3; Gresik Decl. ¶ 9, Ex. H.) Subsequently, in January 2018, Mr. Remaly claimed that the contract he had executed to purchase his WBW ownership had omitted 10,000 bonus matching credits that Wyndham had offered him at the time of purchase. (Remaly Dep. 16:4–11.) To remedy Mr. Remaly's complaint, Wyndham and Mr. Remaly agreed that Mr. Remaly would execute a rewritten WBW contract. (Second Amended Complaint (Dkt. 39) ("SAC") ¶ 10; Remaly Dep. 28:22–29:3.) On February 2,

2018, Mr. Remaly executed the rewritten contract (contract number 001361800071) (the "Rewritten Contract"). (Gresik Decl. ¶ 11, Ex. J.)

Upon Mr. Remaly's execution of the Rewritten Contract, the money Mr. Remaly paid pursuant to the Original Contract was transferred to the Rewritten Contract. (Gresik Decl. ¶ 3, Ex. B, Transcript of the Deposition of Kasey Hunt ("Hunt Dep.") 38:21–39:25.) At Mr. Remaly's insistence, Wyndham subsequently sent Mr. Remaly a letter confirming the cancellation of the Original Contract, although Wyndham's business practice was to wait until the rescission period for the Rewritten Contract had passed before it confirmed the cancellation of the Original Contract. (Remaly Dep. 28:5–11; *see also* Gresik Decl. ¶ 10, Ex. I.) On February 16, 2018, after Mr. Remaly received the letter from Wyndham confirming that cancellation, Mr. Remaly sent Wyndham a letter exercising his statutory rescission rights to rescind the Rewritten Contract, which Wyndham honored, processing the rescission on February 26, 2018. (Remaly Dep. 35:7–12.) Based upon Wyndham's standard business procedures, upon rescission of the Rewritten Contract, the Original Contract was reactivated, and Mr. Remaly's payment was returned to that account. (Hunt Dep. 48:1–11.) Wyndham sent Mr. Remaly a letter informing him of the cancellation of the Rewritten Contract. (Remaly Dep. 34:23–35:6.)

Mr. Remaly remained in good standing with respect to the Original Contract until April 2018, when he disputed the credit card charge for his down payment on the contract with Citibank. (Hunt Dep. 127:18–128:15.) In response, Citibank charged-back Mr. Remaly's down payment and refunded it to him. (Remaly Dep. 52:25–53:7.) As a result, Mr. Remaly was in default on the Original Contract pursuant to its terms, for failure to pay the requisite down payment, and in October 2019, Wyndham accordingly cancelled the Original Contract. (Hunt Dep. 127:18–128:15.)

In January 2020, in the ordinary course of furnishing information to the consumer reporting agency to which it reports, Wyndham reported its cancellation of the Original Contract for non-payment and subsequent repossession of the Vacation Credits granted by the Original Contract. (SAC ¶¶ 18-20; Remaly Dep. 74:24–75:3; Hunt Dep. 127:18–128:15.) Mr. Remaly sent a written dispute directly to Wyndham, leading Wyndham to open a case with its Owner Care department. (Remaly Dep. 40:13–41:1; Gresik Decl. ¶¶ 12–13, Exs. K, L.) The Owner Care department determined that the Original Contract was valid, and that Mr. Remaly was in default for failure to pay the down payment. (Gresik Decl. ¶¶ 12–13, Exs. K, L.)

Mr. Remaly also disputed this negative treatment with Equifax three times, in January, May, and July 2020. (Gresik Decl. ¶¶ 16–18, Exs. O, P, Q.) Because Wyndham's business records at the time it received the disputes showed that the Original Contract was operative and enforceable, Wyndham reasonably concluded that it was accurately reporting the status of Mr. Remaly's account. (Hunt Dep. 127:10–128:15; Expert Report of John Ulzheimer (Dkt. 50-1) ("Ulzheimer Report") at 15–17.) Wyndham timely responded to each of the Equifax disputes verifying the information as reported on Mr. Remaly's consumer report. (Gresik Decl. ¶ 5, Ex. D, Transcript of the Deposition of Lovelyn Sarmiento ("Sarmiento Dep.") 55:20–25; Gresik Decl. ¶¶ 16–18, Exs. O, P, Q.)

Mr. Remaly then filed regulatory complaints with various regulatory agencies in California and Florida. (Remaly Dep. 68:6–24.) These investigations by both Wyndham, and the state consumer agencies resulted in no finding of wrongdoing by Wyndham. (Remaly Dep. 66:10–67:17, 69:8–70:2.)

Wyndham conducted multiple reasonable investigations into Mr. Remaly's complaints concerning not only the existence of the Original Contract, but also the negative credit reporting,

and, found that both were valid each time. Nonetheless, after receiving continued disputes and complaints from Mr. Remaly, Wyndham ultimately decided as a good faith gesture, to request that the consumer reporting agencies to which it reports remove the negative marks from Mr. Remaly's credit history, and to return Mr. Remaly the underlying payments he made under his timeshare contract. (Hunt Dep. 104:9–15.)

Mr. Remaly filed this lawsuit, claiming only that Wyndham failed to conduct a reasonable investigation of his credit disputes in violation of 15 U.S.C. § 1681s-2 and seeking damages for loss of credit opportunities and emotional distress.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way' and 'an issue of fact is material if under the substantive law it is essential to the proper disposition of the claim.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)).

### II. PLAINTIFF'S DISPUTE AS TO THE VALIDITY OF HIS CONTRACT WITH WYNDHAM IS NOT A BASIS FOR AN FCRA CLAIM

#### A. Plaintiff's Underlying Contract Dispute With Wyndham Cannot Be The Basis For A § 1681s-2 Claim

Plaintiff's dispute with Wyndham over the ongoing validity of the Original Contract cannot be the basis for a claim pursuant to 15 U.S.C. § 1681s-2—the only claim Plaintiff raises against Wyndham. As a matter of law, Plaintiff does not have a private cause of action against Wyndham based solely on his claim that Wyndham failed to furnish accurate information to the consumer reporting agencies. Wyndham, as a furnisher of information, may only be held liable for failing to

conduct a reasonable investigation upon notice of Plaintiff's dispute. *See Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) (no private right of action against a furnisher for reporting inaccurate information).

Under § 1681s-2(b), when a furnisher of credit information, like Wyndham, is informed of a dispute by a consumer reporting agency, the furnisher must:

> (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

*Maiteki v. Marten Trans. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (quoting *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir. 2013)). A furnisher's investigation must be reasonable, in other words "'one that a reasonably prudent person would undertake under the circumstances.'" *Id.* (quoting *Seamans v. Temple Univ.*, 744 F.3d 852, 864 (3d Cir. 2014)). "'[H]ow thorough an investigation must be to be 'reasonable' turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.'" *Id.* (quoting *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012)). "Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1160 (9th Cir. 2009).

Notwithstanding this duty to conduct a reasonable investigation when given notice of a dispute, furnishers do not have "an obligation to ensure that the debts they report would survive any and all legal challenges." *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 277 (S.D.N.Y. 2020) (citing *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 38–39 (1st Cir. 2010)). This is because furnishers, like CRAs, are not qualified to resolve legal disputes regarding the

validity of debts. *Chiang*, 595 F.3d at 38; *see also Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) ("A reasonable reinvestigation, however, does not require [consumer reporting agencies] to resolve legal disputes about the validity of the underlying debts they report.").

Recently, in *Edwards v. Med-Trans Corp.*, the U.S. District Court for the Northern District of Alabama addressed a claim in which the plaintiff alleged that an air-ambulance service violated 15 U.S.C. § 1681s-2 by reporting to credit reporting agencies that he was delinquent on a debt he did not believe he owed. Case 2:20-cv-00114-CLM, 2021 WL 1087228, at *1-*2 (N.D. Ala. Mar. 22, 2021). The court held that the plaintiff could not state a claim under § 1681s-2 where the "'complaint concerns a contractual dispute that requires resolution by a court of law, not a credit reporting agency. As such, the complaint does not allege a factual inaccuracy in the credit reports and does not contain allegations sufficient to raise a right to relief on [the plaintiff's] FCRA claims.'" *Id.* at *4 (quoting *Batterman v. BR Carroll Glenridge, LLC*, 829 F. App'x 478, 481–82 (11th Cir. 2020)).

Here, Plaintiff's claim suffers from the same insufficiency. The crux of Plaintiff's claim is that he disputes the ongoing validity of the Original Contract after February 2018. (Remaly Dep. 7:1–4, 80:3–18.) Whether the Original Contract was valid after February 2018 is a contractual dispute that requires resolution by a court of law, not a credit reporting agency. As the *Edwards* court held, Plaintiff's contract dispute cannot be the basis for an FCRA claim.

### B. Wyndham Has Always Maintained That The Original Contract Was Valid After the Cancellation of the Rewritten Contract

Wyndham has always maintained that the Original Contract was reinstated and remained valid after Plaintiff cancelled the Rewritten Contract until Wyndham agreed, as a customer service, to cancel Mr. Remaly's Original Contract. As discussed in detail below, throughout the time period

that Plaintiff was submitting credit disputes to Wyndham through Equifax, Wyndham believed that the Original Contract was in full force and that Plaintiff had defaulted on the Original Contract by withdrawing his down payment through a credit card chargeback. Wyndham's internal system of record reflected that position. Accordingly, as in *Edwards*, any dispute between Plaintiff and Wyndham about Wyndham's investigations of his credit disputes is, in fact, a dispute over the legal status of the Original Contract, not a dispute over the accuracy of Wyndham's credit reporting or the reasonableness of its investigations.

It is Wyndham's typical process when it rewrites a contract with an owner that if the owner rescinds the rewritten contract, the original contract is reinstated. (Hunt Dep. 45:25–46:3; 48:1–11; 49:21–50:6.) Undisputed evidence reflects that Wyndham reinstated the Original Contract after Plaintiff cancelled the Rewritten Contract. (Hunt Dep. 45:25–46:3.) Thus, Wyndham had a reasonable belief that the Original Contract was in force when, in April 2019, Plaintiff convinced his credit card company to charge-back his down payment for the Original Contract, causing Plaintiff to default on the Original Contract. (Hunt Dep. 127:10–128:15.)

Because Plaintiff's down payment was no longer fully paid, Wyndham began reporting the Original Contract as being in default for lack of down payment and cancelled the Original Contract. (Hunt Dep. 127:10–128:15.) Wyndham's internal records reflect that on February 3, 2020, an internal committee at Wyndham reviewed and denied Plaintiff's ongoing requests to rescind the Original Contract. (Hunt Dep. 131:12–132:16; Gresik Decl. ¶ 15, Ex. N.) Following further exchanges with Plaintiff, on June 12, 2020, Kasey Hunt, Wyndham's then-Manager of Owner Solutions decided, as a customer service, to grant Plaintiff's rescission request and give him a full refund. (Hunt Dep. 104:9–15.) At that time, Ms. Hunt instructed Becky Cartwright, a member of Wyndham's owner resolutions team, to begin the process of rescinding and refunding the Original

Contract. (Hunt Dep. 100:14–101:3.) This rescission process was completed on August 5, 2020. (Hunt Dep. 133:24–134:3.) Until August 5, 2020, Wyndham's internal records accurately reflected the status of the Original Contract as cancelled for default. (Hunt Dep. 134:4–16.) Wyndham's Credit Dispute team requested the deletion of the Wyndham tradeline from Mr. Remaly's credit history on August 6, 2020. (Gresik Decl. ¶ 14, Ex. M.)

### C. Wyndham's Credit Reporting Was Consistent With Its Internal Records

From the time the Original Contract was reinstated following Plaintiff's February 2018 rescission of the Rewritten Contract until Wyndham's ultimate rescission and refund of the Original Contract on August 5, 2020, Wyndham's credit reporting was consistent with its internal records of Plaintiff's account. Wyndham's policies and procedures for responding to credit disputes require that the information in the automated consumer dispute verification ("ACDV") received from the credit bureaus matches the relevant fields in Wyndham's internal system of record, called Mainframe, or in the Blackbird system that is used to backup Mainframe. (Sarmiento Dep. 75:20–76:6; Gresik Decl. ¶ 19, Ex. R.) Levelyn Barber, the Wyndham employee primarily responsible for investigating and responding to ACDVs, testified that, as her regular business practice, she follows these procedures each time she responds to an ACDV. (Gresik Decl. ¶ 4, Ex. C, Transcript of the Deposition of Levelyn Barber ("Barber Dep.") 27:25–28:20; 46:3–47:1.)

Undisputed testimony by John Ulzheimer, a 30-year veteran of the credit reporting industry, shows that Wyndham's procedures for responding to ACDVs are consistent with industry standards. Mr. Ulzheimer testified that it is common practice amongst furnishers of credit information like Wyndham to respond to ACDVs by comparing the information provided by the credit bureau to the furnisher's internal system of record. (Gresik Decl. ¶ 7, Ex. F, Transcript of the Deposition of John Ulzheimer ("Ulzheimer Dep.") 86:24–87:7; 92:11–93:15.) Furnishers are responsible for determining whether to report that a consumer is liable for a debt, and accordingly

it is appropriate for a furnisher to refer to its own internal records when investigating a credit dispute. (Ulzheimer Dep. 48:5–11; Ulzheimer Report at 13–17.) Accordingly, it was consistent with consumer credit industry standards for Wyndham to report Plaintiff's time share loan as a repossession and verify that information in response to ACDVs for as long as it was consistent with Wyndham's system of record. (Ulzheimer Dep. 92:11–93:15; Ulzheimer Report at 15–17.) It was also consistent with industry standards for Wyndham to refrain from including a dispute notation on Plaintiff's tradeline until Plaintiff had disputed the tradeline three times. (Ulzheimer Dep. 125:13–16; Ulzheimer Report at 14.) Since 2017, the credit reporting industry's trade association, the Consumer Data Industry Association ("CDIA") has instructed data furnishers not to respond to disputes initiated by the credit bureaus with "disputed" notations. (Ulzheimer Report at 14.) Even before 2017, it was industry practice for the entity receiving the dispute from the consumer, in this case Equifax, to indicate that the account was disputed. (*Id.*) In this case, Wyndham properly investigated and responded to each dispute.

Because Wyndham's credit reporting and ACDV responses were at all times consistent with its internal system of record, even if Plaintiff's claim constitutes a credit reporting dispute and not a dispute of the validity of the underlying contract, Plaintiff cannot show that Wyndham violated § 1681s-2. Section 1681s-2 only requires that a furnisher refrain from furnishing information it has "reasonable cause to believe . . . is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). As in *Edwards*, a furnisher does not violate this duty by continuing to report a debt which it has reason to believe is valid, even where the consumer disputes the debt's validity. *Edwards*, 2021 WL 1087228, at *1-*2. Here, Wyndham had reason to believe, based on its internal records and following multiple internal investigations, that the Original Contract was enforceable. For these reasons, Wyndham is entitled to summary judgment on Plaintiff's sole claim against it.

## III. PLAINTIFF CANNOT RECOVER DAMAGES UNDER THE FCRA FOR REMOVING HIMSELF FROM THE MORTGAGE MARKET

Even if Plaintiff did have a legally cognizable FCRA claim, Plaintiff cannot sufficiently show that he sustained an actual injury. Plaintiff alleges damages for lost credit opportunities and emotional distress. (SAC ¶ 58.) Nonetheless, Plaintiff cannot, as a matter of law, recover damages for lost credit opportunities where he cannot show that he applied for, and was denied, a specific credit opportunity. Where a plaintiff has not applied for and been denied a credit opportunity as a result of a defendant's credit reporting, courts cannot "infer that the [defendant's] negative credit reporting precluded Plaintiff from obtaining further loans as he contends." *Llewellyn*, 711 F.3d at 1181. The Tenth Circuit's decision in *Llewellyn* is consistent with the Second Circuit's holding in *Casella v. Equifax Credit Info. Servs.* that "[w]hether or not [a plaintiff] had the wherewithal to obtain a mortgage . . . in the absence of any evidence that [plaintiff] made an offer to purchase property or applied for a home mortgage, the 'lost opportunity' damages he alleged were too speculative." 56 F.3d 469, 475 (2d Cir. 1995); *see also Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 32 (2d Cir. 2016) (summary order) (holding that a consumer failed to raise an issue of material fact sufficient to survive summary judgment on his FCRA claims where he "failed to raise a genuine issue as to whether he suffered any damages from [defendant's] allegedly negligent failure to detect the inaccuracy of information about" information on the consumer's report).

Plaintiff has not presented any evidence that he was denied any credit opportunities as a result of Wyndham's credit reporting. In fact, Plaintiff admits that he chose not to apply for a mortgage during the period at issue without ever being told that his application would be denied or that he would not receive a mortgage on desirable terms. (Remaly Dep. 90:5–7.) Plaintiff also attempts to point to the denial of a checking account. But, Plaintiff has failed to show that the denial of a checking account was related to Wyndham's tradeline on his credit report and not any

other information on his credit report. Moreover, the checking account Plaintiff was allegedly denied is not a form of credit such that the denial would constitute a loss of a credit opportunity. (Ulzheimer Report at 18.) Accordingly, Plaintiff cannot support his claim for damages due to a loss of a credit opportunity.

Wyndham is entitled to summary judgment on Plaintiff's claim for damages for lost credit opportunities.

## IV. PLAINTIFF CANNOT PROVE THAT WYNDHAM CAUSED THE OTHER DAMAGES HE ALLEGES

In addition to his failed bid for lost credit opportunity damages, Plaintiff seeks damages for emotional distress and loss of quality of life. Plaintiff has produced no evidence of either category of damages aside from his own testimony. In fact, the testimony of Plaintiff's own expert witnesses and his own medical and psychiatric records contradict his claim that Wyndham caused his emotional distress or impacted his quality of life in a compensable way.

Plaintiff's allegation that he suffered emotional distress as a result of Wyndham's credit reporting is contradicted by his own expert's notes and his own medical records. As an initial matter, Dr. Leslie Hannon, Plaintiff's one-time psychologist and expert witness, has testified that she does not intend to offer an expert opinion as to whether Plaintiff's alleged emotional distress was caused by Wyndham's conduct (Gresik Decl. ¶ 8, Ex. G, Transcript of the Deposition of Dr. Leslie Hannon ("Hannon Dep.") 19:15–17.) Dr. Hannon's testimony as to the link between Plaintiff's claimed emotional distress and Wyndham's conduct is based solely Plaintiff's own reports of his condition after Plaintiff asked Dr. Hannon to submit a letter on his behalf in this case. (Hannon Dep. 8:3–9:5).

Plaintiff concedes that he was being treated for anxiety, including through medication, long before he initiated the credit disputes at issue in this case. (Remaly Dep. 99:1–16.) Dr. Hannon's

treatment notes reflect a number of other sources of emotional distress in Plaintiff's life from July 2019 when Dr. Hannon began treating Plaintiff through April 30, 2021. Moreover, Dr. Hannon's notes do not mention Wyndham in any way until November 2020, after Plaintiff filed his initial complaint in this lawsuit. (Gresik Decl. ¶ 20, Ex. S at REM0570.) In fact, the first mention of Wyndham in Dr. Hannon's notes is on November 19, 2020, after Wyndham agreed to cancel the Original Contract and remove it from Plaintiff's credit report, and after Plaintiff initiated this lawsuit. At that time, Dr. Hannon noted that Plaintiff "talked at length about having panic attacks recently and tied it to a time share venture through Wyndham that impacted his credit."(*Id.*) The very next note is a summary of a telephone conversation she had with Plaintiff's counsel "about ethical considerations in forensic matters." (*Id.*) This means that from July 2019 through November 2020, during a time when Plaintiff alleges that he was suffering emotional distress as a result of his dispute with Wyndham, Plaintiff never mentioned this distress to his therapist.

Plaintiff's medical records also ascribe alternative causes to his emotional distress, and make no mention of Wyndham. Plaintiff's medical records from October 18, 2018 (REM0604), January 15, 2019 (REM0583), November 11, 2019 (REM0612), and April 12, 2020 (REM0637) all note that he denied experiencing anxiety or depression. (Gresik Decl. ¶ 21, Ex. T.) Not until November 3, 2020, after Plaintiff filed this lawsuit, do Plaintiff's medical records indicate that he reported anxiety. (*Id.* at REM0624) However, at that time, Plaintiff reported that he was experiencing anxiety due to an abusive relationship, not his dealings with Wyndham. (*Id.*) There is simply no evidence, other than Plaintiff's uncorroborated assertions, that Plaintiff's alleged emotional distress was caused by his dealings with Wyndham.

Similarly, Plaintiff's claim of reduced quality of life is entirely uncorroborated. Plaintiff's economic damages expert, Dr. Stan Smith, testified that he would not render an opinion as to

whether Plaintiff's quality of life had actually been damaged. (Gresik Decl. ¶ 6, Ex. E, Transcript of the Deposition of Dr. Stan V. Smith ("Smith Dep.") 49:4–8.) Instead, Dr. Smith's report simply provides valuation options should a jury find that Plaintiff's quality of life was damaged as a result of Wyndham's conduct. (Smith Dep. 47:5–48:7.) The only evidence that Plaintiff actually suffered such an injury is his own testimony, which itself is heavily reliant on his uncorroborated claim for emotional distress damages. (Remaly Dep. 83:4–10.)

Accordingly, even if Plaintiff is able to prove that Wyndham violated the FCRA, he has produced no evidence other than his own uncorroborated testimony that he suffered any injury as a result.

## CONCLUSION

For the reasons stated above, Wyndham respectfully requests that the Court enter an order granting its motion for summary judgment and dismissing Plaintiff's claim against it, with prejudice.

Dated: July 14, 2021

Respectfully submitted,

/s/ Christi A. Lawson

Christi A. Lawson
Foley & Lardner LLP
Fla. Bar No. 0498351
111 N. Orange Ave.
Ste. 1800
Orlando, FL 32801
Telephone: 407.224.3235
Fax: 407.648.1743
clawson@foley.com

Andrew C. Gresik
Foley & Lardner LLP
WI Bar No. 1104650
150 E. Gilman St.
Ste. 5000

Madison, WI 53703
Telephone: 608.258.4235
Fax: 608.258.4258
agresik@foley.com

*Attorneys for Wyndham Resort Development Corporation d/b/a Worldmark by Wyndham*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2021, I filed the foregoing with the Clerk of Court through the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Andrew C. Gresik*
Andrew C. Gresik