# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2

 3   MARK D. REMALY, an          :
     individual,                 :
 4                               :
          Plaintiff,             :
 5                               : Civil Action
      vs.                        : No.20-cv-3028-LTB-
 6                               : NYW
     WYNDHAM RESORT              :
 7   DEVELOPMENT CORPORATION     :
     d/b/a Worldmark by          :
 8   Wyndham, an Oregon          :
     Corporation,               :
 9                               :
          Defendant.             :
10

11      VIRTUAL
        DEPOSITION OF:   MARK D. REMALY
12
        PURSUANT TO:     Notice by Counsel for
13                       Defendant

14      DATE:            Monday, April 26, 2021

15
        TIME:            11:00 a.m. to 2:43 p.m.
16      REPORTED BY:     Jessica Tenenbaum
                         Notary Public
17                       State of Florida at Large

18

19

20

21

22

23

24

25                  Pages 1 - 125
```

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    7

1      Q.    And what was erroneous about the credit report?

2      A.    Two parts.  That it claimed that I owed a debt

3   to Wyndham, and also that there was involuntarily

4   repossession, neither of which are true.

5      Q.    Is that information still appearing on your

6   credit report today?

7      A.    I do not believe so.

8      Q.    Do you know when it was removed?

9      A.    I do not know.

10     Q.    At some point in time, did you have a

11  relationship with Wyndham?

12     A.    Yes.

13     Q.    What was that relationship?

14     A.    I had signed a contract in October of 2017.

15     Q.    And what was that contract for?

16     A.    Um, vacation credits.

17     Q.    Did you have any other relationship with

18  Wyndham at that time?

19     A.    Me, personally, no.

20     Q.    Where did you sign that contract with Wyndham?

21     A.    San Diego, California.

22     Q.    And what was your intent to signing that

23  contract?

24     A.    Could you specify or rephrase?

25     Q.    Sure.

Transcript of Mark D. Remaly
Conducted on April 26, 2021                          13

1    contract the rewrite.

2            Do you understand that?

3    A.    I do.

4    Q.    Thank you.

5            When you signed the original contract, did you

6    have an understanding that maintenance fees may increase

7    over time?

8    A.    I did, yes.

9            MS. LAWSON:  All right.  I'm going to share my

10   screen for Exhibit 1.

11           Andrew, if you will share that for me?

12           MR. VEDRA:  Can we number them --

13           MS. LAWSON:  I'm sorry?

14           MR. VEDRA:  I'm -- I'm just saying, can we

15   number them something other than Exhibit 1?  Because

16   we already have an Exhibit 1.  So we want to

17   continue off the prior numbering, that would avoid a

18   lot of confusion, or if we want to mark them

19   something differently, that way we don't have two

20   exhibit ones, two exhibit twos, two exhibit threes,

21   et cetera.

22           MS. LAWSON:  Yeah, we have them premarked for

23   today.  I have no objection changing it.

24           So for today we can mark D-1 and then -- and

25   then -- and then pick up where we left off.

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    14

```
 1              MR. VEDRA:  Okay.
 2    BY MS. LAWSON:
 3         Q.   All right.  So I'm going to show you what's
 4    been marked Defendant's Exhibit 1 Mr. Remaly, can you
 5    see this document.
 6         A.   I can see part of it, yes.
 7         Q.   Is that better?  Can you see more of the
 8    document now?
 9         A.   I can see more of it, yes.
10         Q.   I'm going to scroll to the second page.
11              Do you recognize this document?
12         A.   I do.
13         Q.   What is this document?
14         A.   The original contract.
15         Q.   And it's dated October 12th, 2017.
16              Does that meet with your recollection of when
17    you signed it?
18         A.   It does.
19         Q.   And did you understand the DocuSign signature
20    in the left-hand corner to be your electronic signature?
21         A.   I do.
22         Q.   All right.  You had mentioned that you had
23    purchased for the -- paid for the entire contract
24    upfront; is that correct?
25         A.   It is.
```

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                15

1       Q.    How did you pay for that contract?

2       A.    Well, you're showing the receipt for the

3   Mastercard payment of $9,249, and I think you already

4   passed the other receipt for the $15,000 that was paid

5   through PayPal.

6       Q.    So the 15,000 that's showing here on this page,

7   you said was paid through PayPal?

8       A.    Correct.

9       Q.    And then the 9,249, how was it paid?

10      A.    Through Mastercard.

11      Q.    Was it your understanding that those -- the

12  total of those two was the entire purchase price of the

13  contract?

14      A.    Correct.

15      Q.    Scrolling down to the top of the page that says

16  security agreement.

17            Do you see that?

18      A.    I do.

19      Q.    Was this part of the contract that you

20  received?

21      A.    It was.

22      Q.    And at the top it says vacation credits

23  purchased, 10,000.

24            Do you see that?

25      A.    I do.

Transcript of Mark D. Remaly
Conducted on April 26, 2021                          16

1          Q.    Is it -- was it your understanding that 10,000
2     was the right amount of vacation credits?
3          A.    Correct.
4          Q.    Do you know where in the document that it
5     should have reflected the bonus credits?
6          A.    Um, I believe that that was omitted, which was
7     the reason why Wyndham wanted it to be rewritten.
8          Q.    And is it your claim that the vacation credits
9     purchased here would have been a larger amount?
10         A.    No.  My claim is that there's 10,000 bonus
11    credits that are missing.
12         Q.    So my question is:  If 10,000 is missing, are
13    you claiming that this should have been 20,000 vacation
14    credits purchased here?
15         A.    I'm not claiming that.
16         Q.    Did you review this contract prior to signing
17    it?
18         A.    To a limited extent.
19         Q.    And did you understand that it -- what would
20    happen if you were not to pay under the contract?
21         A.    I understand that now.
22         Q.    And what do you understand now?
23         A.    I understand, generally, the terms of the
24    contract.
25              MS. LAWSON:  I'm going to pull up the second

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    28

```
 1        Q.   And when you say the transaction, are you
 2   referring to the transfer of the money?
 3        A.   Correct.
 4   BY MS. LAWSON:
 5        Q.   Okay.  I'm going to show you what's been marked
 6   as Defendant's Exhibit 4. Do you recognize that
 7   document.
 8        A.   I do.
 9        Q.   What is it?
10        A.   A confirmation from Wyndham that the original
11   contract had been rescinded.
12        Q.   At the time of your e-mail with Ms. Kay on
13   February 20th, had you received this letter?
14        A.   I had not.
15        Q.   Is this the documentation that you would be
16   expecting from your request to Ms. Kay?
17        A.   It's similar, yes.
18        Q.   And what did you understand this letter to be
19   rescinding?
20        A.   Rescinding the original contract, ending in
21   1014.
22        Q.   Okay.  All right.  I'm going to show you what's
23   been marked as Defendant's Exhibit 5.
24             All right.  Mr. Remaly, can you see this
25   document?
```

1      A.    I can see part of the document, yes.

2      Q.    Do you recognize it?

3      A.    It appears to be the rewritten contract.

4      Q.    Did you have time to review this document?

5      A.    Can you specify what you mean by that?

6      Q.    Sure.

7            At the time that -- that you signed this

8    document, did you review it?

9      A.    Not to the extent that I wanted to, no.

10     Q.    Why?

11     A.    Um, because I was on vacation, and I was given

12   an arbitrarily short deadline by Wyndham.

13     Q.    Did you tell Ms. Kay that you needed more time?

14     A.    No, she didn't give me any more time.

15     Q.    Did you ask her for more time?

16     A.    I did not specifically ask for more time.

17     Q.    Did you advise Ms. Kay that you were on

18   vacation and needed more time?

19     A.    I did not, no.

20     Q.    Is it your understanding that this contract --

21   let's strike that.

22           You mentioned earlier that you had a problem

23   with this contract.

24           What were your problems with this contract?

25     A.    It was the incorrect number of bonus credits

Transcript of Mark D. Remaly
Conducted on April 26, 2021                            34

```
 1        A.   -- ask.  To my knowledge.

 2        Q.   Okay.  So let me be very clear.  After seeing

 3   this document on February 9th, 2018, did you ask anybody

 4   at Wyndham about this form, or the fact, or -- stop

 5   there.  Strike that.

 6             Did you ask anybody about this form?

 7             MR. VEDRA:  Objection.  Form.

 8             THE WITNESS:  Um, you're referring to --

 9        February 9th was when the contract was signed.

10             When it was presented to me, several days

11        earlier, I did have a conversation with Wyndham

12        about why it did not reflect the correct number of

13        bonus credits.

14   BY MS. LAWSON:

15        Q.   Okay.  Who did you have that conversation with?

16        A.   I do not know.

17        Q.   But you signed this on February 9th, 2018,

18   correct?

19        A.   Correct.

20        Q.   Okay.  I'm going to show you what's been

21   marked as Defendant's Exhibit 6, as soon as my mouse

22   will work.

23             Okay.  Mr. Remaly, can you see Exhibit 6?

24        A.   I can.

25        Q.   Do you recognize that document?
```

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                    35

```
1        A.   I do.

2        Q.   What is it?

3        A.   It's a confirmation from Wyndham that the

4   rewrite contract had been rescinded.

5        Q.   And what's the date of that letter?

6        A.   February 27.

7        Q.   Had you in fact requested that the rewritten

8   contract be rescinded?

9        A.   I had.

10       Q.   When did you make that request?

11       A.   Um, I believe it was made on February 16th,

12   2018.

13       Q.   Between the time that you signed the rewritten

14   contract on February 9th -- on or about the 6th --

15   February --

16            THE COURT REPORTER:  I'm sorry, you cut out.

17       Between the time that you signed the contract?

18            MS. LAWSON:  On February 9, 2018.

19   BY MS. LAWSON:

20       Q.   -- and the time that you requested the

21   rescission of the rewritten contract, did you speak with

22   anybody at Wyndham regarding your concerns?

23       A.   I don't recall.

24       Q.   Did you have any correspondence with anybody at

25   Wyndham regarding your concerns?
```

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    40

```
1        A.    Um, that exact number would be in evidence.

2        Q.    You had the $9,249 reversed on your Mastercard,

3   correct?

4        A.    Correct.

5        Q.    And the other payment you made was from PayPal,

6   correct?

7        A.    Correct.

8        Q.    So was it the PayPal payment you were seeking

9   to have refunded?

10       A.    That was part of it, yes.

11       Q.    What was the other part?

12       A.    The maintenance fees that I paid.

13       Q.     Okay.  I'm going to show you what's been

14   marked as Defendant's Exhibit 8.

15             Can you see that document, Mr. Remaly?

16       A.    No.

17       Q.    Can you see it now?

18       A.    Yes.

19       Q.    Do you recognize that document?

20       A.    I do.

21       Q.    What is it?

22       A.    It's a letter of demand that I wrote to

23   Wyndham.

24       Q.    It's dated January 3rd, 2020.

25             Is that the first of your demand letters?
```

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                41

1      A.   I believe so.

2      Q.   All right.  You state in it, on the second

3   sentence, on February 1st, 2018, it was determined by

4   Worldmark and myself that the contract was deficient.

5        Do you see that?

6      A.   I do.

7      Q.   What was your basis for that statement?

8      A.   Um, my conversations with Wyndham employees.

9      Q.   And which conversations were those?

10      A.   Um, conversations where they told me that there

11   was a problem with my original contract.

12      Q.   And are those the communications we discussed

13   regarding the ultimate -- Wyndham's offer to rewrite the

14   contract?

15      A.   Um, talking specifically about the missing

16   provisions for the bonus credits.

17      Q.   All right.  And then you say on February 2nd, I

18   received an e-mail from Worldmark confirming that the

19   original contact [sic] would be canceled as soon as I

20   re- -- the rewrite was executed.

21        On February 9th, 2018, a new contract, ending

22   in 0071, was signed.

23        And then on February 14th, 2018, I received a

24   letter from Worldmark stating the original contract,

25   ending in 1014, had been rescinded, correct?

1    attached to that demand letter, marked as

2    Wyndham 000219, is a Worldmark by Wyndham, your

3    ownership review.

4           Do you see that?

5        A.   I do.

6        Q.   What is this document?

7        A.   Um, it is an ownership review document that was

8    -- appears to be signed the same time as the original

9    contract.

10       Q.   And if I understand, in the middle it says,

11   bonus credits, two RCI bonus weeks.

12          Do you see that?

13       A.   I do.

14       Q.   Do you understand what that means?

15       A.   Um, I understand what the words mean, yes.

16       Q.   What did you understand this to be telling you?

17       A.   That I would be receiving the incentive of

18   bonus credits and two RCI bonus weeks.

19       Q.   And the date of this is October 12th, 2017,

20   correct?

21       A.   Correct.

22       Q.   So that was given to you as part of the

23   documentation for the original contract?

24       A.   Correct.

25       Q.   Okay.  You also attached a letter from

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                    53

1    April 27th, 2018, from Citi cards.

2              Do you see this?

3        A.   I do.

4        Q.   What is this document?

5        A.   It was a response sent to me from Citi card

6    that detailed the merchant, which in this case is

7    Wyndham's response to my credit dispute.

8        Q.   All right.  It states the merchant has provided

9    documentation stating that the original contract, ending

10   in 0104, was traded into the new contract, ending in

11   0071.  Once the old contract was canceled and converted

12   to the new one, the funds from the old contract were

13   transferred, as well.  However, when the new contract

14   was canceled, there were no funds actually paid to that

15   contract to be refunded since the funds actually came

16   from the old contract; is that correct?

17             MR. VEDRA:  Objection.  Form.

18             THE WITNESS:  That is what it states.

19   BY MS. LAWSON:

20       Q.   Did you understand what that meant?

21       A.   Um, to the extent that I was able to respond to

22   it effectively.

23       Q.   And it says, if you continue to dispute this

24   charge please provide, and it goes on.

25             Did you continue to dispute that charge?

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                    66

1          don't have that available right now.

2     BY MS. LAWSON:

3          Q.    Was that statement based on your own review of

4     the California Business and Professions Code?

5          A.    Yes, it was.

6          Q.    And then you stated, I have forwarded your

7     correspondence to the attorney general to begin an

8     investigation; is that correct?

9          A.    That is correct.

10         Q.    To what attorney general did you forward the

11    correspondence?

12         A.    California, Colorado, and Florida.

13         Q.    For California, do you know the outcome of that

14    investigation?

15         A.    Um, the last communication I had received from

16    them was that Wyndham had acquiesced to my request.

17         Q.    What do you mean by that?

18         A.    They forwarded me the response from Wyndham

19    that said they were returning my remaining balance to

20    me, and they were removing the negative credit report.

21         Q.    When was that?

22         A.    It was the last communication I received from

23    the California attorney general.

24         Q.    Do you know the date?

25         A.    I do not.

Transcript of Mark D. Remaly
Conducted on April 26, 2021                          67

1      Q.   What was the response from the Colorado

2   attorney general?

3      A.   I didn't receive a response from the Colorado

4   attorney general.

5      Q.   Okay.  I believe the third one you said was

6   Florida, correct?

7      A.   Correct.

8      Q.   What was Florida attorney general's response?

9      A.   Same thing.

10     Q.   Same thing as Colorado or California?

11     A.   Same thing as California.

12     Q.   And what was that?

13     A.   Um, that Wyndham had, again, acquiesced to my

14  request and was refunding me the money and removing the

15  negative credit report.

16     Q.   Do you know when that was?

17     A.   I do not.

18     Q.    Okay.  I'm going to show you what's been

19  marked as Defendant's Exhibit 13.

20          Can you see that document, Mr. Remaly?

21     A.   I can.

22     Q.   What is this document?

23     A.   It looks like a complaint letter that I wrote.

24     Q.   Okay.  Who did you write this to?

25     A.   I don't know.  That field is missing on my

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    68

1    copy.

2        Q.    Could this have been the dispute letters that

3    you were sending to the attorney generals?

4        A.    Could be.

5        Q.    Did you send a complaint letter to anyone else?

6        A.    Well, we just discussed the three attorney

7    generals' offices.  Um, there are other entities that I

8    also sent complaints to.

9        Q.    Who were those other entities?

10       A.    Um, Better Business Bureau of Florida.  The --

11   both in California and in Florida.  The governing real

12   estate commissions boards in their respective states.

13       Q.    Anybody else?

14       A.    Not that I recall.

15       Q.    Did you receive a response from the Better

16   Business Bureau in Florida?

17       A.    I did.

18       Q.    What was that response?

19       A.    Um, they also pursued Wyndham with the same

20   complaint, and the final response I received from them

21   was the same as both the attorney generals' offices of

22   California and Florida.  That, Wyndham had acquiesced to

23   my response [sic], and that I was being refunded the

24   money as well as the negative --

25            THE COURT REPORTER:  I'm sorry, had --

Transcript of Mark D. Remaly
Conducted on April 26, 2021                              69

1              THE WITNESS:  -- credit report --

2              THE COURT REPORTER:  -- acquiesced?

3              THE WITNESS:  To my request to have both the

4        remaining balance refunded to me as well as the

5        removal of the negative credit report.

6              THE COURT REPORTER:  Thank you.

7   BY MS. LAWSON:

8        Q.   And you say that the Better Business Bureau of

9   Florida pursued Wyndham.

10             What do you mean by that?

11       A.   They pursued my complaint, that --

12       Q.   I don't --

13       A.   That they continued to follow it.  Followup

14  with Wyndham until it was resolved.

15       Q.   Okay.  The California real estate commission,

16  what -- did you get a response from them?

17       A.   I -- I don't recall what the response was.

18       Q.   How about Florida real estate commission?

19       A.   Um, sort of eventually told me that they did

20  not believe they had jurisdiction.  They considered my

21  complaint -- excuse me, considered my complaint to have

22  merit, but they did not believe that they have

23  jurisdiction since it was signed in California.

24       Q.   Did you receive a letter from them saying that

25  they thought it had merit?

Transcript of Mark D. Remaly
Conducted on April 26, 2021                           70

1        A.    Um, I don't recall.  I -- I had -- I had phone

2    conversations with them, as well, so I'm not sure.

3        Q.    All right.  And then this -- going back to

4    Exhibit 13.

5              You explain on October 12th, 2017, I was

6    staying at Wyndham property in San Diego, California --

7        A.    Uh-huh.

8        Q.    -- known as Harbour Lights as a guest of my

9    parents.

10             THE COURT REPORTER:  I'm sorry.

11   BY MS. LAWSON:

12       Q.    The timeshare --

13             THE COURT REPORTER:  Known as?

14             MS. LAWSON:  Harbour, H-A-R-B-O-U-R, Lights.

15             THE COURT REPORTER:  Okay.

16             MS. LAWSON:  -- as a guest of my parents.

17   BY MS. LAWSON:

18       Q.    The timeshare sales presentation that I

19   attended on that day lasted for over three hours,

20   despite having agreed to only a 90-minute presentation.

21   I have IBS, and having to sit for such a prolonged

22   period of time was uncomfortable and stressful.  I was

23   told during that my ownership would entitle me to access

24   over 5500 resorts worldwide through RCI.

25             What was the point of you including all of this

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                    74

1    time the original contract was signed.  With the bonus

2    points missing in my ownership and not having access to

3    the benefits of silver level, I was not able to book my

4    reservations with the original contract.

5             What were the benefits of silver level that

6    you're seeking?

7        A.   I believe that they're -- that they appear in

8    the original contract.  I don't know what they are off

9    the top of my head.

10       Q.   Was obtaining silver level the reason that you

11   purchased the original contract?

12       A.   Correct.

13       Q.   But you don't recall what that was?

14       A.   I don't recall the specific benefits, but those

15   benefits are laid out in writing in the original

16   contract.

17       Q.   All right.  Then further down in that letter

18   you state that Worldmark has also erroneously made a

19   false credit report to TransUnion on November 3rd, 2019,

20   claiming a repossession --

21            THE COURT REPORTER:  I'm sorry, has

22       erroneously?  You're reading a little too fast.

23            MS. LAWSON:  Sorry.

24            Made a false credit report to TransUnion on

25       November 3rd, 2019, claiming a repossession.  And

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    75

1       Worldmark has additionally made a false credit

2       report to Equifax on January 18, 2020, claiming a

3       repossession.

4   BY MS. LAWSON:

5       Q.   Do you see that?

6       A.   I do.

7       Q.   Did you dispute alleged false credit

8   information to TransUnion?

9       A.   I did.

10      Q.   When did you first dispute it to TransUnion?

11      A.   I don't recall the exact date.

12      Q.   Did you dispute the allegedly false credit

13  information to Equifax?

14      A.   I did.

15      Q.   Do you recall when you reported -- first

16  reported it to Equifax?

17      A.   I don't recall the exact date.

18      Q.   And at the end of the letter you say, on

19  May 1st, 2020, I received a response from TransUnion

20  that they had investigated the false negative credit

21  report to my credit by Wyndham.

22           Do you see that?

23      A.   I do.

24      Q.   What was the response that you received from

25  TransUnion?

1    Equifax?

2         A.    The same as TransUnion.

3         Q.    So if I understand it correctly, the basis of

4    your disputes was because you believed that the

5    contracts had been canceled and therefore you had no

6    obligation to Wyndham.

7              Is that correctly stated?

8              MR. VEDRA:  Objection.  Form.

9              THE WITNESS:  Um, in part, yes.

10   BY MS. LAWSON:

11        Q.    Okay.  How would you correct it?  What's the

12   other part?

13        A.    Um, that there was no repossession.

14        Q.    And there was no repossession because you're

15   claiming there was no contract, correct?

16        A.    Correct.

17        Q.    Any other reason?

18        A.    No.

19        Q.    Okay.  I'm going to show you what's been

20   marked as Defendant Exhibit 15.

21             THE COURT REPORTER:  Mrs. Lawson, is there any

22        way we can take a break?

23             MS. LAWSON:  Absolutely.

24             How about ten minutes?

25             Is that good or you need longer?

Transcript of Mark D. Remaly
Conducted on April 26, 2021 83

1 refer to anything that you've submitted or the expert.

2        I want your explanation about how your quality

3 of life has been affected.

4    A.   Again, quality of life related to emotional

5 damages, related to anxiety, um, stress induced by this

6 experience, um, that will probably continue for quite a

7 long time. Having to go through these types of

8 proceedings, the time that's involved, the distraction

9 from work, and the productivity and quality lost, both

10 personally and professionally.

11    Q.   Okay. Let's take each one of those.

12        How much time did you lose?

13    A.   Um, to date, I think it's probably been

14 estimated, something, several hundred hours of time,

15 that's been lost.

16    Q.   And why did you lose tho- -- that time?

17    A.   Combination of a lot of factors, um, including

18 the time devoted to researching these problems, finding

19 solutions. All of the letters, the research.

20 Everything that was involved in getting to this place

21 and getting the erroneous credit report removed.

22    Q.   Approximately, how much time did you spend

23 researching the problem?

24    A.   Several hundred hours.

25    Q.   Do you have that documented anywhere?

Transcript of Mark D. Remaly
Conducted on April 26, 2021                                    90

1   dollars.

2        Q.   How do you know that?

3        A.   I'm just applying a reasonable standard to

4   logic and drawing a conclusion.

5        Q.   Did you apply for a mortgage anywhere?

6        A.   I did not.  I felt like I could not because of

7   what Wyndham had done.

8        Q.   All right.  Did you apply for a vehicle

9   anywhere?

10       A.   During -- are you -- can you specify?

11       Q.   Yeah.

12            During the time that you're claiming that you

13   were damaged, did you apply for a vehicle?

14       A.   Well, the damage is ongoing.  I'm not -- not

15   saying the damage has stopped.  Obviously --

16       Q.   Why is --

17       A.   -- there's still ongoing damage.

18       Q.   Why is there ongoing damage?

19       A.   Can you specify?

20       Q.   Why is there ongoing damage?

21       A.   Um, stress, anxiety, insomnia.  Quality of life

22   that's been reduced.

23       Q.   Why is that ongoing?

24       A.   Um, because of the trauma that occurred from

25   this event.

Transcript of Mark D. Remaly
Conducted on April 26, 2021                    99

```
1        A.    Her name's already in record.  Leslie Hannon.

2        Q.    How do you spell the last name?

3        A.    H-A-N-N-O-N.

4        Q.    Is Ms. Hannon the one that is -- also conducted

5   the Talk Therapy?

6        A.    Correct.

7        Q.    Is Ms. Hannon also the one that prescribed

8   medications?

9        A.    She's not.

10        Q.    Okay.  Who prescribed you medications?

11        A.    My primary care physician, APEX medicine.

12        Q.    Is there a name of a doctor that you see at

13   APEX medicine?

14        A.    I see different doctors depending on the day

15   that I'm there.

16        Q.    Do you know who prescribed the medicine?

17        A.    I don't know who the last prescriber was.

18        Q.    Okay.  What medication did they prescribe?

19        A.    Xanax and Ambien.

20        Q.    Okay.  How often do you take Xanax?

21        A.    Right now?  Are you specifying, like, right now

22   --

23        Q.    Yes.

24        A.    -- or historically?

25        Q.    Yes, right now.
```

```
 1                        CERTIFICATE OF OATH

 2    STATE OF FLORIDA
      COUNTY OF PINELLAS
 3

 4          I, the undersigned authority, certify that

 5      MARK D. REMALY appeared via Zoom on April 26, 2021

 6      and was duly sworn.

 7             WITNESS my hand and official seal May 10, 2021.

 8

 9

10

11    _____

12    JESSICA TENENBAUM, Court Reporter
      Notary Public, State of Florida
13    Commission No.:  HH 077464
      Expires:  January 9, 2025
14

15

16

17

18

19

20

21

22

23

24

25
```