# EXHIBIT B

Kasey Hunt  30(b)(6)
March 31, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-CV-3028-LTB-NYW

------------------------------------------------------

VIDEOCONFERENCE and 30(b)(6) DEPOSITION OF:

KASEY HUNT - 03/31/2021

------------------------------------------------------

MARK D. REMALY, an individual,

Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC, a Georgia
limited liability company; and WYNDHAM RESORT
DEVELOPMENT CORPORATION d/b/a WorldMark by Wyndham,
an Oregon corporation,

Defendants.

------------------------------------------------------

          The deposition of KASEY HUNT was

taken by the Plaintiff on March 31, 2021,

commencing at the hour of 9:02 a.m., before ROSIE

STAHL, Shorthand Reporter and Notary Public within

and for the State of Colorado.

```
 1           Q    And those phone conversations are
 2   not recorded?
 3           A    Correct.
 4           Q    Now, Mr. Remaly wasn't comfortable
 5   with the process that Ms. Kay was proposing; is
 6   that fair to say?
 7           A    Yes, based on the e-mail.
 8           Q    Right.  And he notified Ms. Kay that
 9   he wasn't comfortable signing a second contract
10   until he knew the first one was cancelled; is that
11   right?
12           A    Yes, that's what the e-mail
13   indicates.
14           Q    And in fact, he thought it would be
15   reckless for him to do that?
16           A    I would have to look for the word
17   reckless.  Yes, I see it.
18           Q    And Ms. Kay responded to Mr.
19   Remaly's concerns; is that right?
20           A    Yes.
21           Q    Okay.  And she told him that Wyndham
22   can't cancel the first contract until they have
23   established the second contract, right?
24           A    Yes.  That is our normal process.
25           Q    Then once that's done, the first
```

1    contract is cancelled, right?
2         A    The way that a rewrite works is the
3    first terms and conditions and the loan obligation
4    that the owner signed into still exists.  Once the
5    rewrite and the new contract has been signed and
6    executed, then the money from the previous
7    contract -- in order to satisfy the rewritten
8    contract, and then the first contract does show in
9    a cancelled status because we received the new
10   modified contract.
11        Q    And that's what was communicated to
12   Mr. Remaly on February 2nd, 2018, correct?
13        A    Yeah.  On our normal process, we
14   cannot cancel a contract without having secured
15   a -- the contract for the rewrite purposes.
16        Q    So the contract stays open until the
17   new contract is established and then the old
18   contract is cancelled, correct?
19        A    Yes, that's typically how it works.
20        Q    That's exactly what Ms. Kay is
21   describing to Mr. Remaly here, that once the new
22   contract is established, the money from the old
23   contract would move to the new contract and the old
24   contract would be closed, cancelled?
25        A    That is our typical process, yes.

```
 1   contract that you need to sign and that's it,
 2   right?
 3           A    Once he's signed it, it would have
 4   given him a copy of all the documents that he
 5   signed.
 6           Q    It would have conveyed him a copy of
 7   the second contract but no other information,
 8   right?
 9           A    There are -- in the 2018 rewritten
10   contract, DocuSign would have provided him with all
11   of the documents he reviewed with Carol and signed,
12   yes.
13           Q    What I want to make sure that I am
14   completely clear on is that except for Exhibit 8,
15   there are no communications between Wyndham and
16   Mark Remaly concerning the rewrite of his first
17   contact into the second contract.
18           A    Other than what we reviewed here
19   today, I have not seen any other communication.
20           Q    So you are not aware of any e-mail
21   communication to Mr. Remaly that states that if he
22   rescinds the second contract, that the first
23   contract would be reinstated?
24           A    I'm not aware of any written
25   communication on those exact words.  That's our
```

```
 1   typical process in a rewrite.  If you rescind the
 2   rewrite, your previous contract is reinstated as
 3   your original terms and conditions.
 4           Q    But there is no written
 5   communications to Mr. Remaly stating that that is
 6   your typical process?
 7           A    Not that I'm aware of in written
 8   form.
 9           Q    And you don't have any recordings of
10   phone calls between any Wyndham employee and Mr.
11   Remaly advising him that if he rescinded the second
12   contract, that the first contract would be
13   reinstated?
14           A    I don't have any recorded phone
15   calls, no.
16           Q    There are no notes that reflect that
17   Wyndham advised Mr. Remaly that if he rescinded the
18   second contract, the first contract would be
19   reinstated?
20           A    I'm not aware of any notes that say
21   that specifically.
22           Q    But there are no records at all that
23   show that Wyndham advised Mr. Remaly if he
24   rescinded the second contract, that the first
25   contract would be reinstated?
```

```
 1                THE DEPONENT:  As I'm aware, there
 2   is no written documentation that was provided in
 3   the e-mails that said that.  Our typical process
 4   is, though, that if you rescind a rewrite, whatever
 5   your previous financial loan obligation, gets
 6   reinstated.
 7   BY MR. VERDA:
 8          Q     That's your current process, too; is
 9   that correct?
10          A     That is our current process as well,
11   yes.  That is our normal process.
12          Q     To advise current customers that are
13   going through a rewrite, you have a document called
14   a funds transfer agreement; is that right?
15          A     We do, yes.
16          Q     That document clearly identifies the
17   consequences of rescinding a rewritten contract?
18          A     It does explain, yes, what will
19   happen, where your money is being transferred for
20   the new contract and that should you rescind the
21   rewrite, then everything goes back to what your
22   financial obligation was previously.
23          Q     That's a standardized document that
24   Wyndham uses?
25          A     It is a standardized document that
```

1   we use currently today.  This is a WorldMark by
2   Wyndham.  It was very rare that we had anybody ever
3   rescind a rewrite for WorldMark by Wyndham, so it
4   was not used in this particular case.  Since then,
5   we have made changes to ensure that we have a funds
6   transfer agreement for WorldMark by Wyndham as
7   well.
8           Q    Okay.  You stated that it would be
9   rare that there was a rescission of a rewrite.  Did
10  I understand you correctly?
11          A    Yes, it's rare.
12          Q    But it has happened; is that right?
13          A    It has happened occasionally but,
14  yes, for the amount of rewrites we do versus
15  rescissions of rewrites, it's a very rare
16  occurrence for WorldMark.
17          Q    Mr. Remaly isn't the only person who
18  rescinded a rewrite; is that right?
19          A    No, he is not the only one that has
20  ever rescinded a rewrite.
21          Q    Are you aware of other instances
22  where a Wyndham customer has rescinded a rewrite
23  with a WorldMark by Wyndham contract and the
24  original contract was then reinstated?
25          A    That would be every occurrence of a

1    rewrite for WorldMark by Wyndham.  That's our

2    standard practice.

3              Q    Are you aware of any other customers

4    complaining that they weren't advised that that was

5    the process?

6              A    I am not, no.

7                   MR. VEDRA:  So we have gone for

8    about an hour.  If it's fine with everybody, we can

9    take about a ten-minute break.

10                  (A break was taken from 9:59 p.m. to

11   10:12 a.m.)

12   BY MR. VERDA:

13             Q    All right.  Okay.  We left off we

14   were talking about Exhibit 8.  I would like to add

15   a new exhibit to the chat marked as Exhibit 25.

16   Ms. Hunt, when you have an opportunity to review

17   it, please let me know.

18                  (Exhibit 25 marked for

19   identification.)

20                  THE DEPONENT:  Yes, I see it.

21   BY MR. VEDRA:

22             Q    Ms. Hunt, are you familiar with this

23   document?

24             A    Yes.

25             Q    What is this document?

1   that correct?
2        A    That is correct.
3        Q    And that's something that you have
4   the authority to do, correct?
5        A    Based on the conversations with
6   Lurline and the decision being made to -- out of a
7   courtesy and a customer service to rescind this
8   owner then, yes, I was able to submit this request
9   for processing.
10       Q    So on June 12, 2020, you had
11  determined that the first contract should be
12  rescinded and a refund issued to Mr. Remaly,
13  correct?
14       A    On June 12th the decision was made
15  to -- as a customer service, like I said, as a
16  customer service to this owner because it was such
17  a rare occurrence that it was rescinded in the
18  rewrite that, yes, we would honor the rescission
19  request and for customer service reasons.
20       Q    But regardless of the reason why you
21  did it, on June 12, 2020, you had made the decision
22  along with Ms. Morris that the first contract
23  should be rescinded and a refund issued to Mr.
24  Remaly, correct?
25       A    Yes.  I believe the decision was

```
 1   through consumer affairs.  Then I was told this is
 2   the decision that was made and then I submitted the
 3   request to Becky to fulfill the decision.
 4           Q     Consumer affairs made the decision
 5   and then you just effected the decision, is that an
 6   accurate way to describe it?
 7           A     Yes, that's typically what happens.
 8           Q     Who in consumer affairs made the
 9   decision that on June 12, 2020, the first contract
10   should be rescinded and a refund issued to Mr.
11   Remaly?
12           A     I don't know the exact name of the
13   person.
14           Q     Aside from e-mailing with
15   Ms. Morris, did you speak with anyone in consumer
16   affairs about Mr. Remaly's first contract?
17           A     No.
18           Q     Is the extent of your involvement
19   with the ultimate rescission and refund to Mr.
20   Remaly contained within this e-mail?
21           A     Can you repeat the question?
22           Q     What I see in this e-mail is that on
23   June 12th Ms. Morris sends you an e-mail, right?
24           A     Yes.
25           Q     And she indicates in her e-mail that
```

Kasey Hunt  30(b)(6)
March 31, 2021

 1          Q    And it was your understanding on
 2    June 12, 2020, that the decision to rescind the
 3    first contract and refund Mr. Remaly his money had
 4    already been made?
 5          A    It was my understanding at the time
 6    of this e-mail that consumer affairs had made a
 7    decision and we were requesting to submit the
 8    process for it.
 9          Q    From your point of view on June 12,
10    2020, there was no debate as to whether the first
11    contract should be rescinded and a refund issue to
12    Mr. Remaly?
13          A    From my point of view on June 12th
14    it was requested of me to submit this for
15    rescission and refund, which is what I did.
16          Q    Following your e-mail exchange with
17    Ms. Morris on June 12th, did you have any more
18    contact with Ms. Morris about Mr. Remaly's first
19    contract?
20          A    I don't recall.
21          Q    I'm going to add a document to the
22    chat that's previously marked as Exhibit 12.
23    Ms. Hunt, do you recognize Exhibit 12?
24          A    I do, yes.
25          Q    What is Exhibit 12?

```
 1    first contract was reinstated, correct?
 2            A     Correct.
 3            Q     And you agree that Mr. Remaly never
 4    used any of the benefits under the first contract;
 5    is that right?
 6            A     I don't know for sure.
 7            Q     You don't know whether he used any
 8    of his vacation credits under the first contract?
 9            A     I do not.
10            Q     But Wyndham believed that Mr. Remaly
11    owed Wyndham money under the first contract; is
12    that right?
13            A     There was a purchase made in 2017
14    that was paid in full, and then there was
15    maintenance fees or dues that were signed off for
16    from the owner that stated that he would pay that
17    monthly.
18            Q     And because Wyndham believed that
19    Mr. Remaly owed Wyndham money under the first
20    contract, it reported derogatory information to Mr.
21    Remaly's credit; is that your understanding?
22            A     My understanding is when the
23    contract was executed, that there was a charge back
24    of some kind of down payment and that prompted a
25    collections because the down payment was no longer
```

1    complete.  And because the down payment was no
2    longer complete, Mr. Remaly owed the difference in
3    the down payment, and then it processed into
4    default because the down payment was not complete.
5           Q     And it's my understanding that
6    Wyndham's position is that because of that charge
7    back and because he hadn't paid any dues, that
8    Wyndham was entitled to foreclose its lien on the
9    vacation credits; is that right?
10          A     I don't know that foreclosure is the
11   appropriate word to use.  I understand that it was
12   defaulted for down payment.  And I don't -- it's
13   outside of my scope.  I have that as reported to
14   the credit agencies but it was a default to down
15   payment and default of dues.
16          Q     So you can't tell me whether Wyndham
17   exercised its rights under Article 9 of the Uniform
18   Commercial Code to repossess Mr. Remaly's vacation
19   credits?
20          A     It is outside of my scope.
21          Q     That would be somebody in the
22   account servicing that would have to testify as to
23   whether there was a repossession that occurred; is
24   that right?
25          A     I believe repossession is done

```
 1   obligation for any other contract, cancellation or
 2   termination of this membership will have no effect
 3   on your other contractual obligations or agreements
 4   through WorldMark.
 5           Q     Then I'm going to upload a document
 6   that Wyndham has produced.  I'm not as fast as Mr.
 7   Vedra, if you will give me one minute.  Mark this
 8   as Defendant's 1.
 9                 (Defendant's Exhibit 1 marked for
10   identification.)
11   BY MS. LAWSON:
12           Q     Are you familiar with this document
13   that's marked Wyndham 00006236?
14           A     Yes.
15           Q     What is this document?
16           A     A case report out of our Wind
17   Tracker system.
18           Q     I'm sorry.  You said case report?
19           A     Yeah, it the case report out from
20   our Wind Tracker system.
21           Q     What is a case report?
22           A     If somebody calls into our care
23   services, notes are taken for what is the concern
24   or what the request is or what the question about
25   product knowledge is, and every time any
```

1   interaction is done with that agent that's

2   assigned, it's marked and recorded into Wind

3   Tracker and this is the report out of that.

4           Q     And under resolution summary, do you

5   see that?

6           A     Yes.

7           Q     It says, denial.  After careful

8   review, the sales reversal committee has decided to

9   deny the owner's request to cancel; is that

10  correct?

11          A     Yes.

12          Q     Do you know what that means?

13          A     That means that the request was sent

14  for review and it was decided that the owner did

15  not have sufficient reasons for requesting a

16  cancellation to be granted.  So it was denied.

17          Q     Is this sales reversal committee, is

18  that a different group than the departments that

19  you were previously referring to with regards to

20  the legal and owner's care committee or owner's

21  care department?

22          A     Yes.  The committee is made up of

23  executives for review of these requests.

24          Q     And to your knowledge, Ms. Hunt,

25  when was the cancellation of the first contract

```
 1    effectuated on Wyndham's system?
 2            A     When was the first cancellation --
 3    I'm sorry.  Can you repeat the question?
 4            Q     Sure.  When was the first -- the
 5    contract, the original first contract -- the
 6    contract we have been referring to as the first
 7    contract, when was it ultimately processed on
 8    Wyndham's system as being cancelled?
 9            A     It was processed as a recission
10    after the rewrite was completed in February of
11    2018.
12            Q     Then at some point was it
13    reinstated?
14            A     Yes.  Once the rewrite was rescinded
15    or the rewrite was rescinded, that put them back to
16    their financial obligation for their previous
17    contract, which reinstated the contract.
18            Q     When was that contract?  You said it
19    was reinstated.  Was that ultimately cancelled?
20            A     Yes.  As a customer service decision
21    to the owner, Wyndham decided to cancel the
22    original purchase.
23            Q     One second.  All right.
24                  Ms. Hunt, I'm going to go back to
25    Exhibit 21.  Can you tell us the date that the
```

```
 1   recission of that first contract was ultimately
 2   processed in Wyndham's system?
 3           A     It appears August 5, 2020.
 4           Q     Prior to that date, would that
 5   contract have been reflected as being rescinded on
 6   Wyndham's system?
 7           A     Prior to that date I believe it
 8   showed cancelled.
 9           Q     And that cancellation was due to Mr.
10   Remaly's request to rewrite the contract, correct?
11                 MR. VEDRA:  Form.
12                 THE DEPONENT:  The 2017 previously
13   was cancelled due to down payment default.  There
14   was a request in 2018 to rewrite the contract,
15   which then would have shown this contract at that
16   time as rescinded.
17                 MS. LAWSON:  Okay.  That's all I
18   have for you.
19                 MR. VEDRA:  I do have some recross.
20                       EXAMINATION
21   BY MR. VERDA:
22           Q     Ms. Lawson asked you about
23   Exhibit 24, which is the second contract between --
24   or excuse me, the first contract -- strike that.
25                 Ms. Lawson asked you about
```

Kasey Hunt  30(b)(6)
March 31, 2021

1                     REPORTER CERTIFICATE

2

                I, ROSANNE M. STAHL, Shorthand
3    Reporter and Notary Public within and for the State
     of Colorado, do hereby certify that previous to the
4    commencement of the testimony, the said KASEY HUNT
     was sworn by me to testify to the truth in relation
5    to the matters in controversy between the said
     parties so far as she should be interrogated
6    concerning the same; that the said deposition was
     taken in stenograph by me at the time and place
7    aforesaid and was thereafter reduced to typewritten
     form; that the foregoing is a true and correct
8    transcript of my stenographic notes thereof; and
     that Deposition Exhibits 22-34 were marked and used
9    in the interrogation.
                I further certify that I am not
10   employed by, related to, nor counsel for any of the
     parties herein, nor otherwise interested in the
11   event of this action.
                IN WITNESS WHEREOF, I have affixed
12   my signature and seal this 14th day of April, 2021.

13

14

15                        _____
                          Rosanne M. Stahl
16                        Notary Public
                          P.O. Box 464
17                        Kremmling, CO 80459

18

19
     MY COMMISSION EXPIRES: 03/28/22
20

21

22

23

24

25