**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-CV-3028-LTB-NYW

MARK D. REMALY, an individual,

Plaintiff(s),
v.

WYNDHAM RESORT DEVELOPMENT CORPORATION d/b/a WorldMark by Wyndham, an Oregon corporation,

Defendant(s).

---

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Mark D. Remaly ("**Plaintiff**"), by and through his undersigned counsel, hereby responds to Defendant Wyndham Resort Development Corporation d/b/a WorldMark by Wyndham's ("**Wyndham**") Motion for Summary Judgment.

**I.      INTRODUCTION**

Plaintiff twice purchased, and twice rescinded, vacation credit contracts with Wyndham. Each time, Wyndham confirmed, in writing, that the contracts were rescinded. Despite written confirmation that the contracts were rescinded, Wyndham ruined Plaintiff's impeccable credit by reporting that Wyndham had repossessed his vacation credits. Wyndham never repossessed anything. Plaintiff properly disputed this inaccurate information on multiple occasions, but Wyndham responded that its reporting was accurate—even after Wyndham's consumer affairs department had determined that Wyndham was in error.

Nevertheless, Wyndham claims it did not violate the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "**FCRA**") and that it is entitled to summary judgment. Wyndham's Motion for Summary Judgment (the "**Motion**") misstates the facts and attempts to turn this case into a contract dispute. This case is not a dispute about the validity of a contract. This case is about whether

Wyndham wrongly verified that repossession occurred and whether Wyndham conducted a reasonable investigation into Plaintiff's credit disputes. As Wyndham concedes, furnishers of credit information, like Wyndham, "are responsible for determining whether to report that a consumer is liable for a debt . . . ." (Mot. at 9). Each time Plaintiff disputed the incorrect credit reporting, Wyndham did not reasonably investigate the dispute, and did not delete the inaccurate information that Wyndham's own, internal records contradicted. As a result, Plaintiff refrained from seeking credit to buy a home, planned to immigrate to Australia where his credit would not be ruined, and experienced significant, compensable emotional distress.

## II.      RESPONSES TO STATEMENT OF UNDISPUTED FACTS

1.      Admit.  Additionally, Plaintiff was promised 10,000 "bonus credits".  (See Additional Undisputed Fact ¶ 4) (hereinafter "**AUF**").[1]

2.      Admit.  Additionally, Wyndham admitted that it failed to deliver the 10,000 bonus credits.  (See AUF ¶ 6).

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit that Wyndham sent the letter confirming that Wyndham had rescinded the Original Contract.  Deny that Plaintiff had "insisted" that Wyndham send the letter.  The excerpt from Plaintiff's deposition is misleading.   The letter confirming the Original Contract was rescinded is dated February 14, 2018.  (Ex. 4).  The e-mail allegedly "requesting" the letter was six days later.  (Ex. 3 at REM0072). Further denied that it is "Wyndham's business practice" to "wait until the rescission period for the Rewritten Contract had passed" before sending the letter. There is no reference to materials in the record to support this position. Fed. R. Civ. P. 56(c)(1)(A).

7.      Admit.

---

[1] Wyndham provided its statement of material facts in narrative form without identifying facts by a paragraph number. To assist the Court in reviewing the disputed facts, Plaintiff has listed and numbered the facts in attached Appendix A, and responds in that order.

8.    Irrelevant.  Ms. Hunt testified that this process was "not used in this particular case." (Ex. 16 at 46:16-49:7).

9.    Admit.

10.    Denied.  Up to at least May 9, 2018, internal Wyndham communications reflect that the Original Contract was marked as "rescinded".  (See AUF ¶ 14).

11.    Admit.

12.    Denied.  The Original Contract was rescinded.  (See Ex. 3, 4, 24, 25).

13.    Admit.

14.    Admit.

15.    Denied.  Neither of the referenced exhibits states that Plaintiff was in "default" and Wyndham ultimately concluded that it was in error.  (See Ex. 24, 25).

16.    Admit.

17.    Denied.  (See Ex. 3, 4, 24, 25).

18.    Admit that responses were timely but not accurate.  (See Ex. 3, 4, 24, 25).

19.    Admit.

20.    Denied.  The referenced materials do not support the statement that the complaints resulted in "no finding of wrongdoing by Wyndham".  (Ex. A at 68:6-24).

21.    Denied.  There is no reference to materials in the record to support this position. Fed. R. Civ. P. 56(c)(1)(A).

22.    Denied.  Wyndham's decision to correct its error was a recognition that it was incorrect and not a "good faith gesture".  (See Ex. 24, 25).

23.    Denied.  There is no reference to materials in the record to support this position. Fed. R. Civ. P. 56(c)(1)(A).  Plaintiff's damages are described below.  (See AUF ¶¶ 49-60).

## III.    ADDITIONAL UNDISPUTED FACTS

1.    Plaintiff Mark Remaly is a thirty-six year old patent examiner who currently resides in Denver, Colorado.  He has worked in the same position for over twelve years, has been

financially successful, has previously purchased and sold two homes, and has always valued and maintained good credit.  (Ex. 1 ¶¶ 1-4).

2.      Wyndham sells "vacation credits", which permit owners to stay at a variety of resorts owned or operated by Wyndham.  Vacation credits are personal property. (Ex. 1 ¶ 5).

3.      In October of 2017, he took a vacation to San Diego, California, and stayed at the "Wyndham Balboa Park".  (Ex. 1 ¶ 5).

4.      After being promised 10,000 "bonus credits", Plaintiff purchased 10,000 vacation credits at a total cost of $24,249.00 for 20,000 credits.  (Ex. 1 ¶ 6).

5.      Plaintiff paid $15,000.00 through PayPal and $9,249.00 through his Citi credit card. (Ex. 1 ¶ 7).

6.      In January of 2018, Plaintiff contacted Wyndham to ask when the bonus credits would be added to his account and learned that they were not included in his contract.  (Ex. 1 ¶ 8-9).  Wyndham acknowledged that it had failed to deliver the bonus credits.  (Ex. 2).

7.      Carol Kay insisted that Plaintiff would have to sign a new contract to replace the Original Contract in order to receive his bonus credits.  (Ex. 3).

8.      Ms. Kay told Plaintiff that "the original contract 1361701014 will be canceled once [Wyndham moves] the money from it to the new contract."  (Ex. 3 at REM0067).

9.      Wyndham never told Plaintiff that rescinding the new contract would reinstate the Original Contract.  (Ex. 1 ¶ 14, Ex. 3).

10.     On February 9, 2018, Plaintiff signed the Rewritten Contract.  (Ex. 3 at REM0070).

11.     The Rewritten Contract permits the consumer to "cancel this contract without any penalty or obligation within seven (7) calendar days of receipt of the public report or after the date you sign this contract, whichever is later."  (Ex. I at WYN000048).

12.     On February 14, 2018, Wyndham sent a letter to Mr. Remaly stating that: "We have completed you request to rescind the [Original Contract]."  (Ex. 4).  On February 20, 2018, Ms. Kay confirmed this in writing.  (Ex. 3 at REM0071).

13.     On February 16, 2018, after determining the Rewritten Contract was deficient, Plaintiff timely rescinded the Rewritten Contract.  (Ex. 5).  On February 27, 2018, Wyndham confirmed, in writing, that the Rewritten Contract had been rescinded.  (Ex. 6).

14.     As of May 9, 2018, Wyndham's records showed both contracts as "rescinded".  (Ex. 7 at WYN000697).

15.     Plaintiff never received notice that the Original Contract was reinstated.  His account was never reactivated and he never received the vacation credits promised by the Original Contract.  (Ex. 1 ¶ 27).  After the contract was rescinded, Wyndham never billed Plaintiff for monthly charges as it would on an active contract.  (Ex. 8)

16.     Following the rescission of the Rewritten Contract, Wyndham failed to refund the purchase price despite requests from Plaintiff.  (Ex. 1 ¶ 22).

17.     Plaintiff disputed the $9,249.00 charge with Citibank.  (Ex. 9).  Citibank investigated the dispute, and on October 12, 2018, credited Plaintiff's card account.  (Ex. 10).

18.     On October 18, 2018, Wyndham demanded that Mr. Remaly pay $9,249.00.  (Ex. 11).

19.     Wyndham reported to both TransUnion and Equifax that Wyndham had "involuntarily repossessed" Plaintiff's timeshare credits.  (Ex. 12 at REM0251).

20.     Wyndham did not repossess anything.  (Ex. 13 at 5).

**Wyndham's Credit Dispute Procedures**

21.     Wyndham has one employee—Levelyn Barber—responsible for handling credit disputes received by Wyndham from TransUnion and Equifax.  (Ex. 14 at 17:9-11).

22.     Ms. Barber has no formal credit dispute training.  The extent of her training was sitting next to the prior credit dispute operator and observing her.  (Ex. 14 at 19:13-20).

23.     Consumer credit disputes received by either TransUnion or Equifax are transmitted to Wyndham through a web-based computer system called "e-OSCAR".  The dispute forms are called Automated Credit Dispute Verifications (ACDVs) and are synonymous with "credit disputes".  (Ex. 15 at 15-16).

24.     An ACDV contains information provided by the consumer and interpreted by the CRA.  (Id.)  An ACDV may also contain copies of the documents received by the CRA from the consumer.  (Id.)

25.     Wyndham does not save ACDVs and does not save the documents attached to an ACDV.  (Ex. 14 at 33:3-21).  The only record of responding to a dispute that Wyndham maintains is a record of the response and not what was done in the investigation.  (Ex. 14 at 39:18-40:8).

26.     Ms. Barber typically works on credit disputes for four hours a day; handles between thirty and forty disputes per day; and spends, on average, eight to ten minutes responding to each dispute.  (Ex. 14 at 18:25-19:6, 42:19-20).

27.     Wyndham maintains consumer information in multiple different databases.  (Ex. 16 at 86:9-88:15).

28.     The primary database, or "system of record", is called "Mainframe".  (Id.)

29.     Mainframe contains information concerning the current status of an account and account notes.  Mainframe purges this information into a system called "Blackbird".  (Ex. 16 at 115:24-116:4).

30.     Because furnishers of credit information maintain information in multiple different databases, most furnishers review multiple other computer systems when responding to a credit dispute in addition to their internal system of record.  (Ex. 15 at 13).

31.     Ms. Barber does not have access to databases containing communications with consumers, including communications concerning rescission.  (Ex. 17 at 38:17-39:19).

32.     When investigating an ACDV, Ms. Barber reviews only Mainframe and Blackbird, does not review other systems, and does not speak to any person.  (Ex. 14 at 62:19-63:16).

33.     Unless the account status in Mainframe is "rescinded", Ms. Barber has no way of knowing whether the contract was rescinded.  (Ex. 14 at 64:21-25).  Ms. Barber would not look at communications with the customer or go beyond Mainframe.  (Ex. 14 at 84:23-85:3).  If Mainframe is incorrect, Ms. Barber has no way of knowing that.  (Ex. 14 at 85:4-7).

34.     Each time Ms. Barber investigated Plaintiff's disputes, Ms. Barber went through the cursory tasks of clicking through various screens to process the dispute, looked at Mainframe, and then decided how to respond.  Ms. Barber did not even review the documents submitted with the first and second dispute until *after* she had decided how to respond.  (Ex. 18 at 2-3) ("Clicked the Images tab in the ACDV.  Viewed all attached images." These images are the documents submitted with the dispute).

**The First Equifax Credit Dispute**

35.     On January 23, 2020, Plaintiff disputed Wyndham's credit reporting to Equifax online.  (Ex. 19).

36.     This dispute stated that the account was "mutually rescinded" and the balance was to be refunded to Mr. Remaly in accordance with Wyndham's letter.  (Id.)

37.     On January 30, 2020, Ms. Barber responded to this dispute by confirming that the reporting was accurate.  She did not look for the letter referenced in the ACDV.  (Ex. 18 at 2-3)

**The Second Equifax Credit Dispute**

38.     On April 19, 2020, Mr. Remaly disputed Wyndham's credit reporting by letter.  (Ex. 20).  Equifax received this dispute on April 29, 2020, and promptly forwarded it to Wyndham.  (Ex. 21).  Plaintiff attached to this dispute both contracts, both letters stating the contracts were rescinded, and his correspondence with Carol Kay stating the contract was "cancelled" and "closed".  (Exs, 3, 4, 6).

39.     On May 5, 2020, Ms. Barber again responded to the dispute, and again she confirmed the credit reporting was accurate.  (Ex. 21).  She did not look for any of the documentation included or referenced in the ACDV.  (Ex. 14 at 81:10-82:25, Ex. 18 at 2-3).

**The Florida Attorney General Complaint**

40.     On May 16, 2020, Plaintiff complained to the Florida Department of Business Professional Regulation concerning Wyndham's actions. (Ex. 22).

41.     On June 1, 2020, a Division investigator wrote to Wyndham and asked whether Wyndham had notified Plaintiff that rescinding the Rewritten Contract would reinstate the Original

Contract.  This letter also points out that Wyndham's prior responses to Plaintiff were inconsistent with "the verbiage he received from Carol Kay in her e-mail to him on February 2, 2018."  (Ex. 23)

42.     As a result of these complaints, Lurline Morris of Wyndham consumer affairs conducted an internal investigation and requested that Wyndham cancel the Original Contract and provide a full refund.   (Ex. 24).

43.     On June 12, 2020, Kasey Hunt agreed with Ms. Morris's request.  Ms. Hunt then requested the Original Contract to be coded as rescinded and a refund issued to Plaintiff.  Ms. Hunt noted that Wyndham "changed our process" and now "obtain a funds transfer agreement".  (Id.).

44.     Ms. Hunt testified that (1) Wyndham never informed Plaintiff in writing that rescinding the Rewritten Contract would reinstate the Original Contract and (2) the "funds transfer agreement"—where a customer agrees that rescinding a rewritten contract reinstates the original contract—was a standard practice for all contracts *except* the type that Plaintiff had.  (Ex. 16 at 48:23-49:7).

45.     On July 20, 2020, Wyndham's internal workflow records contained the following: "Legal has determined that since we didn't give the owner anything in writing say that if they [sic] rescinded the rewrite we would reinstate the original contract, we should update the original contract to show as Rescinded instead of Cancel/Repo."  (WYN0000663).

**The Third Equifax Credit Dispute**

46.     On July 14, 2020, Plaintiff again disputed the credit reporting in writing, (Ex. 26), and submitted the documentation showing that the Original Contract had been rescinded.  (Exs. 4, 6).  Equifax again forwarded this to Wyndham.  (Ex. 27).

47.     On July 21, 2020, Ms. Barber again responded to the dispute, and again she confirmed the credit reporting was accurate.  (Ex. 27).

48.     When Ms. Barber confirmed that the credit reporting was accurate, Wyndham had internally determined that the Original Contract was incorrectly coded as "Cancel/Repo" and should have been correctly coded as "Rescinded".   (Exs. 24, 25).

**Plaintiff's Damages**

49.     In February 2018, Plaintiff had moved to Broomfield to live with his parents and save additional funds for a down payment to purchase a home in Colorado.  (Ex. 1 ¶ 55).

50.     Plaintiff had previously owned homes in Washington D.C. and San Diego, California.  He was aware of the requirements to obtain a favorable mortgage: excellent credit, a significant down payment, consistent income demonstrated by continued employment, and the capacity to make a mortgage payment.  (Ex. 1 ¶ 4).

51.     Plaintiff had a significant down payment saved, had been working in the same job for more than nine years, and had the ability to make mortgage payments.  (Ex. 1 ¶ 2-4, 55).

52.     Prior to Wyndham's incorrect credit reporting, Plaintiff had excellent credit and did not have any derogatory items on his credit report.  (Ex. 28 at 29:14-23, 33:8-24).  The only negative item ever on Plaintiff's credit report was Wyndham's tradeline.  (Id.)

53.     "Repossession" is considered a "major derogatory" event and one of the "Seven Deadly Sins" of credit.  (Ex. 28 at 29:3-30:21, 39:10-16).

54.     It is commonly known that good credit is necessary to obtain credit on the most favorable terms.  (Ex. 28 at 29:3-30:21, 39:10-16).

55.     Plaintiff recognized that Wyndham's negative credit reporting would cause him either not to be approved for a home loan or less favorable terms.  (Ex. 1 ¶ 57).

56.     On June 29, 2020, Plaintiff received a letter from Citi denying his application to open a checking account, based on his Equifax credit report, notwithstanding his existing relationship with Citi, including multiple savings and credit card accounts.  (Ex. 29).

57.     Plaintiff refrained from applying for a mortgage as a result of Wyndham's failure to reinvestigate and delete the inaccurate credit reporting. (Ex. 1 ¶ 57).

58.     Plaintiff suffered emotional distress as a result of Wyndham's failure to reinvestigate and delete the inaccurate credit reporting. (Ex. 1).

59.     Plaintiff applied to immigrate to Australia as a result of Wyndham's failure to reinvestigate and delete the inaccurate credit reporting.  (Ex. 1 ¶ 44).

60.    Stan Smith, Ph. D., opined that Plaintiff suffered damages as reflected in his report. (Ex. 30).

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

"Summary judgement per Rule 56 is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." EMC Ins. Cos. v. Mid-Continent Cas. Co., 884 F. Supp. 2d 1147, 1153 (D. Colo. 2012) (quotations and citations omitted).  "Under this standard, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party."  Id.

### B.    The Fair Credit Reporting Act

The FCRA "is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it."  Cortez v. Trans Union, LLC, 617 F.3d 688, 722 (3d Cir. 2010).  "The purpose of FCRA is to ensure accuracy and fairness in credit reporting and to require that such reporting is confidential, accurate, relevant, and proper."  Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1245 (10th Cir. 1999).  "FCRA enables consumers to protect their reputations and to protect themselves against the dissemination of false or misleading credit information."  Id. (citations omitted).

Plaintiff's sole claim is under 15 U.S.C. § 1681s-2(b).  "FCRA Section 1681s-2 imposes duties on furnishers of information to CRAs to help achieve the FCRA's purpose."  Nelson v. Equifax Info. Servs., LLC, 522 F. Supp. 2d 1222, 1229 (C.D. Cal. 2007).  Under this section, a furnisher is required to:

> (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1178 (10th Cir. 2013).

## V.     ARGUMENT

Wyndham raises four arguments as to why it is entitled to summary judgment.  First, Wyndham claims that Plaintiff's credit disputes concerned legal issues and not factual issues, and therefore, Wyndham cannot be held liable for its actions.  Second, Wyndham claims that it has *always* maintained that it properly reinstated Plaintiff's Original Contract.  Third, Wyndham asserts that its credit reporting was consistent with its internal records.  And fourth, Wyndham contends that Plaintiff either cannot obtain the damages he seeks or he will not be able to prove that he suffered damages.  Wyndham is wrong on the law and the facts in each of these arguments, and is not entitled to judgment as a matter of law.

### A.     Wyndham Is Liable To Plaintiff For Failing To Conduct A Reasonable Investigation Of His Credit Disputes.

Both Wyndham and its expert admit that "[f]urnishers are responsible for determining whether to report that a consumer is liable for a debt . . . ."  (Mot. at 9, Ex. 15 at 15). Notwithstanding this concession, Wyndham contends that Plaintiff's FCRA claim fails because this is a dispute over the ongoing validity of the Original Contract, and argues disputes over the legal validity of debts cannot be the subject of a claim under 15 U.S.C. § 1681s-2(b).

Wyndham's argument is wrong on the facts and the law.  First, there is no factual dispute that the underlying contract was rescinded and no repossession occurred.  Second, a furnisher, like Wyndham, is responsible for investigating liability.  Third, the limited cases that have held that furnishers are not liable for improperly investigating disputes do not apply here.

#### 1.     Wyndham mischaracterizes Plaintiff's claims as a dispute about the validity of his rescinded contract.

Wyndham contends that Plaintiff's credit disputes were about the ongoing validity of the Original Contract.  Without offering any standard to distinguish a legal dispute from a factual dispute, Wyndham argues that Plaintiff's claims are not actionable because they are disputes about liability and not factual inaccuracy.  Wyndham is wrong.  Plaintiff's disputes were about facts.

First, whether the contract was rescinded is an issue of fact, not law.   Wyndham unconditionally promised to cancel and close the Original Contract upon execution of the Rewritten Contract.  (Ex. 3).  On February 14, 2018, Wyndham confirmed—in writing—that the Original Contract was rescinded.  (Ex. 4).  After Plaintiff determined that the Rewritten Contract was again deficient, he rescinded that contract.  (Ex. 5).  Again, on February 27, 2018, Wyndham confirmed—in writing—that the Rewritten Contract was rescinded.  (Ex. 6).  These are all facts, and they are the only facts that Wyndham had to investigate to determine that "we should update the original contract to show as Rescinded instead of Cancel/Repo."  (Ex. 25).

Second, Wyndham never repossessed Plaintiff's vacation credits.  Plaintiff disputed that an "involuntary repossession" ever occurred.  (Exs. 19, 20, 21, 26, 27).  A repossession is "[t]he act or an instance of retaking property; esp., a seller's retaking of goods sold on credit when the buyer has failed to pay for them."   Black's Law Dictionary, 10th ed. 1493.   According to Wyndham's expert, in the credit reporting context, a repossession consists of taking merchandise that secures an obligation.  (Ex. 28 at 39:17-42:18).  A self-help repossession requires the secured creditor to: take possession of the collateral; provide notice that the collateral has been taken; sell the property; and provide notice of the sale and any surplus or deficiency.  Cal. U.C.C. §§ 9609(a)(1), 9610(a), 9611(c), and 9616(b).[2]  Wyndham's credit reporting expert agreed that "whether a repossession actually occurred is an issue of fact . . . ."  (Ex. 28 at 46:8-11).  Accordingly, there must be some indicia of an actual repossession for the credit reporting to be factually accurate.

For there to be a *re*-possession, there must be possession.  Plaintiff never received the vacation credits after Wyndham allegedly "reinstated" his Original Contract.  He was never billed for annual maintenance charges, and he was never given access to the account permitting him to

---

[2] Article 9 of the Uniform Commercial Code governs repossession of personal property.  Cal. Uniform Comm. Code 9101 *et seq.*  Plaintiff refers to the California UCC because that is where the original contract was entered into and is likely the applicable law.  The other versions of the UCC that might apply (Colorado, Florida) are functionally equivalent to the California UCC.  e.g C.R.S. §§ 4-9-609. 610, 611, and 616; Fla. Stat. § 649.609, 610, 611, and 616.

book reservations.  There is no evidence in the record that reinstating the contract delivered anything to Plaintiff that Wyndham could then repossess.

Further, Plaintiff asked Wyndham to identify all documents that reflected that Wyndham repossessed Plaintiff's vacation credits.  (Ex. 13 at 5).  In response, Wyndham identified two pages: (1) the portion of Plaintiff's contract that states Wyndham has remedies upon default; and (2) a document that states that Wyndham may contact Plaintiff on his cell phone.  (Id., Ex. 31).  In short, Wyndham has no documentary proof that it took the vacation credits, notified Plaintiff, sold the credits, or provided an accounting of the proceeds of sale.  In other words, there is no proof that Wyndham repossessed anything.

Plaintiff took the Rule 30(b)(6) deposition of Wyndham on "the factual basis of [Wyndham's] contention that [Wyndham] 'repossessed' the collateral securing the [Orginal Contract] . . . ."  (Ex. 32 at 5-6).  Neither Rule 30(b)(6) designee could offer any information, let alone proof, that an actual repossession occurred.  Lovelyn Sarmiento testified that the only threshold issue for reporting an account as a "repossession" is whether the account was "cancelled" in Mainframe, which is simply "changing the account status to cancelled in Mainframe."  (Ex. 17 at 137:2-25).  Cancellation simply means that Wyndham has "cancelled the consumer's benefits under their WorldMark by Wyndham contract."  (Ex. 17 at 48:16-24, 137:12-25).  Kasey Hunt, Wyndham's second designee, testified that she had no knowledge of whether there was an actual repossession, and her understanding of repossession is that the contract is marked as cancelled and nothing else.  (Ex. 16 at 128:5-130:4).  A repossession simply never happened, and that is a matter of fact, not law.  Accordingly, Plaintiff's disputes concerned a factual inaccuracy.

## 2.    Furnishers are responsible for investigating liability.  CRAs are not.

Wyndham is improperly attempting to apply law applicable to claims against CRAs to claims against furnishers.  "To achieve its purpose, the FCRA places distinct obligations on three types of entities: consumer reporting agencies ('CRAs'), users of consumer reports, and furnishers of information to CRAs."  Ware v. Bank of Am. Corp., 9 F. Supp. 3d 1329, 1337 (N.D. Ga. 2013).  "The FCRA imposes duties on consumer reporting agencies and furnishers in a manner consistent

with their respective roles in the credit reporting market." Denan v. Trans Union LLC, 959 F.3d 290, 294 (7th Cir. 2020).  These different roles are straightforward.  "Furnishers—such as banks, credit lenders, and collection agencies—provide consumer data to consumer reporting agencies." Id.  CRAs then "compile the furnished data into a comprehensible format, allowing others to evaluate the creditworthiness of a given consumer." Id.

The FCRA imposes different dispute investigation duties on CRAs and furnishers consistent with their differing roles.  As to CRAs, the FCRA requires them to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . ."  15 U.S.C. § 1681i(a)(1)(A).  "Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims." Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, 891 (9th Cir. 2010).  Requiring CRAs to assess legal defenses to a tradeline would convert CRAs into tribunals adjudicating the legal validity of the underlying claim.  Consequently, "reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts." Id. at 892.  In distinguishing between the complimentary but distinct investigation duties of CRAs and furnishers under the FCRA, the Ninth Circuit stated that a CRA's duties to reinvestigate disputed information under 15 U.S.C. § 1681i are more limited than a furnisher's obligations to investigate under 15 U.S.C. § 1681s-2(b).  See Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1157 (9th Cir. 2009) ("the 'reasonable' qualifier attached to a CRA's duty to reinvestigate limits its obligations on account of its third-party status . . . .").

By contrast, a furnisher's investigation obligations are greater.  Under a separate section of the FCRA, furnishers are required to investigate disputes received by CRAs and forwarded to the furnisher.  15 U.S.C. § 1681s-2(b).  Unlike Section 1681i, which requires a CRA to determine whether information is "inaccurate", 15 U.S.C. § 1681i(a)(1)(A), Section 1681s-2(b) requires furnishers to investigate a "dispute with regard to the *completeness or accuracy of any information* provided by a person to a consumer reporting agency . . . ."  15 U.S.C. § 1681s-2(b)(1)(A) (emphasis added).  Accordingly, a furnisher's duties under Section 1681s-2(b) extend beyond just

"inaccurate" information to information that is incomplete or cannot be verified.   15 U.S.C. § 1681s-2(b)(1)(E).   This means that a furnisher has a duty to correct information that is "clearly inaccurate" and information that is provided "in such a manner as to create a materially misleading impression."  Llewellyn, 711 F.3d at 1186.  This standard is higher than the requirements for CRAs conducting reinvestigations under Section 1681i, which mandates only that the CRA "determine whether the disputed information is inaccurate . . . ."  15 U.S.C. § 1681i(a)(1)(A).

The heightened investigation requirement for furnishers illustrates a deliberate policy decision to impose a greater duty on the person most likely to be able to resolve a dispute concerning liability.  When a furnisher receives a dispute, it does not stand in the same shoes as a CRA that is merely "a third party, lacking any direct relationship with the consumer . . . ."  Carvalho, 629 F.3d at 892.  Instead, the furnisher stands in the shoes of one party to the transaction.  "[A]s the statute recognizes, the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation."  Gorman, 584 F.3d at 1156.  This is why "'[a]ccuracy' for furnishers, however, means information that 'correctly [r]eflects . . . liability for the account . . . .'"  Denan, 959 F.3d at 295 (citing 12 C.F.R. § 1022.41(a)) (ellipsis in original).[3]   Therefore, "[o]nly furnishers are tasked with accurately reporting liability."  Id.  "Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies . . . ."  Id.

 "And it makes sense that furnishers shoulder this burden: they assumed the risk and bear the loss of unpaid debt, so they are in a better position to determine the legal validity of a debt."  Id., accord Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 150 (4th Cir. 2008) ("Claims against furnishers such as BB&T do not raise [the consideration of collateral attack] because the furnisher is the creditor on the underlying debt.").  "Indeed, as the statute recognizes,

---

[3] The Consumer Financial Protection Bureau ("**CFPB**"), the federal agency tasked with administering and enforcing the FCRA, has taken the position that the investigation requirements for furnishers extends to legal disputes.  (Ex. 33)  As a reasonable interpretation of the statute and its own regulations, CFPB's position is entitled to deference.  e.g. Biodiversity Conservation Alliance v. Jiron, 762 F.3d 1036. 1063 (10th Cir. 2014) (citing to Christopher v. SmithKline Beecham Corp., 567 U.S. 142 (2012).

the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation."  Gorman, 584 F.3d at 1156.

Chijioke-Uche v. Equifax Info. Servs., LLC illustrates this point.  No. 19-cv-4006, 2021 WL 2005499 (E.D. Pa. May 20, 2021).  In Chijioke-Uche, the plaintiff brought claims against the furnisher under 15 U.S.C. § 1681s-2(b) and the CRAs under 15 U.S.C. § 1681i(a).  Id.  The issue was whether the plaintiff had voluntarily surrendered a vehicle, which was then reported on his credit.  Id.  Although both claims were based on the same facts, the court dismissed the reinvestigation claims against the CRAs while permitting the investigation claims against the furnisher to proceed.  Id.  Specially, the court dismissed the claims under Sections 1681e and 1681i because the plaintiff's "dispute centers on the validity of the underlying debt" and CRAs are not there to "referee Plaintiff's underlying legal dispute" with the furnisher.  Id. at *8.  Accordingly, the investigation requirements for furnishers are greater than those for CRAs, and Wyndham does not escape liability by characterizing Plaintiff's dispute as a "contract dispute".

In sum, the investigation standards under 15 U.S.C. § 1681s-2(b) require a furnisher to assess the consumer's liability for the debt.  Wyndham concedes as much.  Wyndham states: "Furnishers are responsible for determining whether to report that a consumer is liable for a debt . . . ." (Mot. at 9).  As its expert opined: "Ultimately it is Wyndham's decision whether or not to hold the Plaintiff liable for accounts and/or debts."  (Ex. 15 at 15).  This position is inherently contradictory to Wyndham's position that it has no obligation to investigate "legal inaccuracies".  Wyndham cannot claim the ultimate right of whether to hold consumers liable for debts while simultaneously declining any responsibility for investigating disputes of those debts.  Accordingly, Wyndham is not entitled to summary judgment as a matter of law.

### 3.   Wyndham relies on inapposite case law.

Notwithstanding the plain language of the statute, and Wyndham's concession that furnishers are responsible for determining whether to hold a consumer is liable for a debt, Wyndham contends that "furnishers do not have 'an obligation to ensure that the debts they report

would survive any and all legal challenges.'" (Mot. at 6) (quoting Holland v. Chase Bank USA, N.A., 475 F. Supp. 3d 272, 277 (S.D.N.Y. 2020)). Wyndham's reliance on Holland is misplaced.

Holland involved a dispute over whether the statute of limitations had "outright extinguished" the debt furnished by the debt. 475 F. Supp. 3d at 277. In other words, the plaintiff in Holland posited an affirmative legal defense to a debt and not a dispute as to the existence of the debt itself. By contrast, Plaintiff does not assert that he had an affirmative legal defense to the claimed balance or the alleged repossession. Instead, Plaintiff disputed the tradeline because Wyndham said he was not liable for it and no repossession actually happened.

Wyndham then cites Wright v. Experian Info. Sols., Inc., 805 F.3d 1232, 1242 (10th Cir. 2015) for the proposition that furnishers do not have to investigate legal disputes. Wyndham's reference to Wright is misplaced. Wright was not an FCRA case against a furnisher under 15 U.S.C. § 1681s-2(b). Instead, Wright was a case against a CRA under 15 U.S.C. §§ 1681e(b) and 1681i(a). Wright, 805 F.3d at 1238.

Similarly, Wyndham relies on the Northern District of Alabama's decision in Edwards v. Med-Trans Corp. for the proposition that a contract dispute cannot form the basis of an FCRA claim. (Mot. at 7). Wyndham's reliance on this case is misplaced for the same reasons that relying on Wright is misplaced. The Court in Edwards did not analyze the distinct obligations of CRAs under Section 1681i versus furnisher obligations under Section 1681s-2 to reach its conclusion. See Edwards v. Med-Trans Corp., 2:20-cv-00114-CLM, 2021 WL 1087228, at *4 (N.D. Ala. Mar. 22, 2021). Instead, the Court in Edwards relied only on the 11th Circuit's unpublished decision in Batterman v. BR Carroll Glenridge, LLC for the proposition that "Batterman's complaint concerns a contractual dispute that requires resolution by a court of law, *not a credit reporting agency*." (emphasis added). Id. at *4. An out-of-district, unpublished district court opinion that relies on an out-of-circuit, unpublished circuit court opinion that fails to analyze the distinction between two different parts of the same statute is not binding or persuasive authority on this issue.

This is not a dispute about whether the statute of limitations applies to a debt (like Holland) or whether a consumer can be held liable for a medical bill that he never agreed to in writing (like

Edwards).  This was a dispute about what Wyndham told Plaintiff—his contract was rescinded. And it is about whether a repossession occurred.  After three credit disputes to Equifax, two to TransUnion, and complaints to multiple regulators, Wyndham concluded that Wyndham had incorrectly reinstated the Original Contract and incorrectly reported the tradeline because Wyndham never notified Plaintiff that rescinding the Rewritten Contract would reinstate the Original Contract.  The dispute was resolved when Wyndham investigated the *facts* not the *law*.

### B.      Wyndham Acknowledged That The Original Contract Was Not Valid.

Wyndham contends that it "has always maintained that the Original Contract was valid." (Mot. at 1, 7).  Wyndham further claims that it only canceled Plaintiff's Original Contract "as a customer service." (Mot. at 7, 8).  This is not correct.

On February 14, 2018, Wyndham sent a letter to Plaintiff stating that the Original Contract was rescinded.  (Ex. 4).  Wyndham never told Plaintiff that rescinding the Rewritten Contract would reinstate the Original Contract.  (Ex. 1 ¶ 14).  Nevertheless, Wyndham allegedly reinstated the Original Contract without notice to Plaintiff and without actually providing him with the vacation credits he purchased.  But Wyndham's internal records and its 30(b)(6) designee confirmed that Wyndham's usual practice to reinstate the original contract if a "re-write" is rescinded *did not apply to the type of contract Plaintiff had.*  (Ex. 16 at 48:23-48:7).

After Plaintiff's complaint to the State of Florida, Wyndham consumer affairs conducted a review of Plaintiff's complaints.  In this review, Ms. Morris determined that Wyndham was in error for reinstating the Original Contract.   (Ex. 24).  By June 12, 2020, Ms. Hunt agreed that the process was inadequate, had been changed, and requested that the Original Contract be submitted for a rescission and refund.  (Id.).  On July 20, 2020, Wyndham's internal records reflected that "Legal has determined that since we didn't give the owner anything in writing saying that if they [sic] rescinded the rewrite we would reinstate the original contract, we should update the original contract to show as Rescinded instead of Cancel/Repo." (Ex. 25).  Correcting the Original Contract status and fixing Plaintiff's credit was not an act of benevolence—it was a recognition that

Wyndham's records in Mainframe were wrong, and therefore, it was inappropriate to report a non-existent repossession on a rescinded contract.

### C.      Wyndham's Credit Reporting Was Not Consistent With Its Internal Records.

Wyndham claims that its credit reporting was consistent with its internal records of Plaintiff's account. Moreover, Wyndham claims that its investigations of Plaintiff's disputes were consistent with industry standards. Neither statement is correct.

First, Wyndham's own internal records show that Plaintiff's account was rescinded. Contrary to Wyndham's assertions, its own internal records reflect that: (1) the Original Contract was rescinded; (2) Plaintiff was never told that rescinding the Rewritten Contract would "reinstate" the Original Contract; and (3) Wyndham has no records that a repossession ever occurred. These records existed each time Plaintiff disputed his credit reporting. Indeed, Ms. Barber testified that if she had access to the internal records showing that consumer affairs had requested the Original Contract to be re-coded as rescinded, she would have responded differently to the Third Equifax Dispute. (Ex. 14 at 132:2-135:1). But she did not have access to those records, and Wyndham untimely updated the only system Ms. Barber reviews when responding to credit disputes.

Second, whether Wyndham's credit reporting was consistent with its system of record is not the issue. The issue is whether Wyndham conducted a reasonable investigation of disputed information and deleted or modified information that was inaccurate or incomplete. 15 U.S.C. § 1681s-2(b). Wyndham's investigation was not sufficient according to the law or even its own expert's opinions. "By its ordinary meaning, an 'investigation' requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." Gorman, 584 F.3d at 1155. "[T]he plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors." Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 430 (4th Cir. 2004). Further, an investigation must be reasonable. Maiteki v. Marten Transp. Ltd., 828 F.3d 1272, 1275 (10th Cir. 2016) . "A 'reasonable' investigation 'is one that a reasonably prudent person would undertake under the circumstances.'" Id. The investigation depends, in part, on the information provided to the furnisher in the dispute triggering the

investigation.  Id.  The greater the information, the greater the investigation.  See Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005).  Last, to determine whether an investigation was reasonable, "the court looks to the procedures employed, rather than the results of the investigation."  Collins v. BAC Home Loans Servicing LP, 912 F. Supp. 2d 997, 1011 (D. Colo. 2012).  Unless the procedures employed are reasonable "beyond question", whether the furnisher conducted a reasonable investigation is for the jury to decide.  Westra, 409 F.3d at 827.

Wyndham's procedures are not reasonable beyond question.  Wyndham's expert opined that "most furnishers of information will review the dispute form submitted by the credit bureaus, review their internal system of record, *access multiple other internal and external systems containing account and consumer related information*, and will also have access to review any attachments to the dispute which the consumer may have included with their communication with the credit bureau(s)."  (Ex. at 13, 16) (emphasis added).  Accordingly, an investigation that merely reviews the information that generated the credit reporting in the first instance is insufficient.  To conduct a reasonable investigation, the furnisher must look beyond the system of record and actually investigate the basis for the dispute.  A furnisher cannot simply confirm the data in the ACDV matches the data in the system of record.  After all, the system of record is part of what generates the data in the ACDV, even when Mainframe is wrong.  (Ex. 17 at 46:6-47:9).

Despite its own expert opining that part of any reasonable investigation involves reviewing multiple internal systems containing consumer account information, Wyndham did none of this. Ms. Barber reviewed only the mainframe system.  Ms. Barber did not: (1) review correspondence with Plaintiff; (2) review internal communications that concluded that Wyndham was in error; or (3) consult with any person who could provide her supporting documentation.  (Ex. 18 at 2-3). Instead, she relied only on Mainframe, although she has "no way of verifying that the information in Mainframe is accurate."  (Ex. 14 at 97:4-7).  Rather than conduct an investigation consistent with its own expert's opinions and in compliance with the FCRA, Wyndham did only the cursory glance at its own system of record, Mainframe, which contained the inaccurate information.

Plaintiff's third dispute highlights why looking solely at Mainframe is an inadequate investigation.  On June 10, 2020, Ms. Hunt confirmed that the Original Contract status should be changed from "cancelled/repo" to rescinded.  (Ex. 24).  On July 20, 2020, forty days later, that request was submitted through Wyndham's internal workflow, which noted that: "Legal has determined that since we didn't give the owner anything in writing say that if they [sic] rescinded the rewrite we would reinstate the original contract, we should update the original contract to show as Rescinded instead of Cancel/Repo."  (Ex. 25).  These changes were not noted in Mainframe as of July 21, 2020, and Ms. Barber did not have access to this information.  Consequently, Wyndham again verified the credit reporting as accurate even though it had determined itself to be in error.

### D.      Plaintiff's Damages Are A Question For The Jury.

Wyndham contends that Plaintiff is not entitled to any damages and disputes the causes of his damages.  "A consumer is entitled to actual damages for a negligent violation of the FCRA."  Llewellyn, 711 F.3d at 1179 (citing 15 U.S.C. § 1681o(a)).  "Under § 1681n(a), however, the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1,000."  Id.  Wyndham disputes only that Plaintiff is entitled to actual damages.  Wyndham incorrectly states that Plaintiff is not entitled to damages for abstaining from buying a home, and disputes that Wyndham caused Plaintiff's emotional distress damages.  Under any circumstance, these are questions for the jury, and Plaintiff is further entitled to seek punitive damages for willful violations of the FCRA.

### 1.      Plaintiff is entitled to damages for when Wyndham's inaccurate credit reporting precluded plaintiff from applying for a mortgage.

Wyndham incorrectly claims that Plaintiff may not pursue damages for when he decided not to apply for a mortgage because Wyndham ruined his credit.  The Ninth Circuit has held that an FCRA plaintiff may recover on a reinvestigation claim against a CRA "even absent a denial of credit."  Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995).  "Indeed, a plaintiff may be compensated if she is merely deterred from accessing the credit market because

of inaccuracies on her credit report."  See Long v. Pendrick Capital Partners II, LLC, 374 F. Supp. 3d 515, 529 (D. Md. 2019).

Plaintiff is not seeking damages from a denial of credit.  He is seeking damages for being prevented from using his otherwise impeccable credit to buy a home due to Wyndham's incorrect reporting.  And he was reasonably deterred from seeking to purchase a home.

Knowledge about the importance of credit is widespread and ubiquitous.  Wyndham's own expert agrees.  He has written thousands of articles "that explain the basic truth: that the better your credit, the better your loan."  (Ex. 28 at 27:6-10).  He agreed that "[i]t's generally known that higher credit scores are better than lower scores."  (Id. at 27:11-13).  He further agreed that "a credit score may influence the credit available to the consumer and the terms that lenders offer to a consumer" and that it is "generally known that a credit score influences the terms of credit."  (Id. at 27:19-28:6).   And there is good reason not to apply for credit when your score is low: applying lowers your score.  (Id. at 119:10-12).

Plaintiff's reaction to Wyndham's inaccurate credit reporting was the logical reaction to having a major derogatory item in his file.  Plaintiff is a sophisticated consumer with prior experience owning a home.  He has spent his entire adult life maintaining his good credit and living responsibly within his means.  His credit was impeccable.  Just as a person does not need to touch a boiling pot of water to know that it's hot, Plaintiff did not need to apply for a home loan with an "involuntary repossession" on his credit to understand that he would not get the best terms or even approved.   Indeed, applying and being declined (or being offered unacceptable terms) would actually lower his credit score, and compound the problem.  Plaintiff's fears were born out when Citi denied him a checking account based on his Equifax credit report.  It would be irrational for Plaintiff to apply for a mortgage for hundreds of thousands of dollars when a bank with whom Plaintiff had an existing relationship would not even let him open a checking account.

Unlike the damages in Llewellyn and Casella that were deemed "too speculative", Plaintiff's damages are not.  Plaintiff responded rationally and logically to inaccurate, derogatory credit reporting by waiting to buy a home until after Wyndham rectified its error.  Once Wyndham

corrected its inaccurate reporting, Plaintiff found a home and immediately qualified for a mortgage. (Ex. 1 ¶ 57). But rather than speculating as to the difference in the cost of credit between getting a loan with bad credit and getting a loan with good credit, Plaintiff will ask the jury to award damages based upon the statistically-proven, home-price-appreciation that occurred between when Wyndham violated the FCRA and when Plaintiff purchased a home. These damages are proven by data and supported by the expert testimony of an economist with a Ph. D. from the University of Chicago, one of the preeminent institutions in economics.

### 2.   Wyndham's credit reporting was directly related to Plaintiff's denial of a checking account.

Wyndham claims that "Plaintiff has failed to show that the denial of a checking account was related to Wyndham's tradeline on his credit report and not any other information on his credit report." (Mot. at 11-12). This is inaccurate. Citi denied Plaintiff's application for a checking account based on Plaintiff's Equifax credit report. (Ex. 29). As John Ulzheimer testified, Plaintiff's credit was otherwise clean. (Ex. 28 at 29:14-23, 33:8-24). Mr. Ulzheimer also testified that an "involuntary repossession" is a "major derogatory" event, to be avoided at all costs, and one of the "seven deadly sins" of credit. (Ex. 28 at 29:3-30:21, 39:10-16). The reasonable inference to draw is that the only negative item on Plaintiff's Equifax credit report caused Citibank to deny Plaintiff a checking account.

### 3.   Plaintiff's emotional distress damages are a question for the jury.

Wyndham contends that Plaintiff's emotional distress is "uncorroborated". In the Tenth Circuit, an FCRA plaintiff is not required to produce corroborated testimony to establish emotional distress damages. Llewellyn, 711 F.3d at 1182-83. In the context of a motion for summary judgment, a plaintiff's affidavit is sufficient to defeat the motion if the affidavit describes the plaintiff's emotional distress in sufficient detail and does not rely on conclusory statements. Llewellyn, 711 F.3d at 1182. Further, a plaintiff is "not required to produce evidence to corroborate his detailed and specific testimony in order to survive summary judgment." Id. at

1183.  "Such corroboration goes only to the weight of evidence of injury, not the existence of it." Cortez v. Trans Union, LLC, 617 F.3d 688, 720 (3d Cir. 2010).

Here, Plaintiff's emotional distress is a disputed issue of fact for the jury to decide.  As reflected in Plaintiff's affidavit, Wyndham's failure to investigate and delete inaccurate credit reporting caused Plaintiff significant emotional distress.  It was so significant, in fact, that Plaintiff applied for a visa to immigrate to Australia, (Ex. 36), where Wyndham's negative credit reporting would not affect him.  Wyndham's violations of the FCRA were so severe that Plaintiff was willing to move to the other side of the world, to a foreign country, and leave his family, friends, life, dog, and livelihood just to avoid the pain that Wyndham caused him.

Wyndham further claims that there are alternative causes of Plaintiff's emotional distress.[4] Aside from being a question for the jury, this is plainly contradicted by Plaintiff's deposition testimony.  Wyndham pointedly asked Plaintiff how he knew that Wyndham caused his emotional distress, and Plaintiff explained that he is capable of determining what caused his emotional distress. (Ex. 34).  Wyndham did not follow up with further questions to this answer.  (Id.)  This is a dispute of material fact, for which summary judgment is not appropriate.

### 4. Plaintiff is entitled to statutory and punitive damages for willful violations of the FCRA.

The FCRA permits a consumer to obtain statutory damages of at least $100.00 and no more than $1,000.00 for willful violations of the FCRA.  15 U.S.C. § 1681n(a)(1)(A).  Further, Wyndham may be liable for punitive damages for willful violations.  15 U.S.C. § 1681n(a)(2). "[T]he consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1,000."  Llewellyn, 711 F.3d at 1179.  In short, Plaintiff may recover statutory damages and punitive damages even in the absence of actual damages, provided that the violation was willful.

---

[4] Wyndham claims that Plaintiff's medical records do not reflect any emotional distress.  (Mot. at 13).  Yet the very same medical records reflect that Plaintiff was taking Xanax, a medication indicated for anxiety.  (Ex. T).

"A willful violation is either an intentional violation or a violation committed by an agency in reckless disregard of its duties under the FCRA." Llewellyn, 711 F.3d at 1183 (quotations omitted). "Recklessness is measured by an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." Llewellyn, 711 F.3d at 1183 (citations and quotations omitted). A furnisher acts recklessly if "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 1183-84 (quotations and citations omitted).

Wyndham does not contest that Plaintiff may be able to recover statutory and punitive damages in the absence of actual damages. Wyndham does not contend that its actions were not willful. Though not an issue raised in the Motion, Plaintiff intends to prove at trial that Wyndham's actions were willful. Wyndham's policy for investigating credit disputes does not comport with Wyndham's own expert's opinion on what constitutes a reasonable investigation. Wyndham's policy is to make a mere cursory review of the information contained in its system of record, contrary to its expert's opinion that a common practice is to review multiple systems containing consumer information.

Plaintiff bore the brunt of that reckless policy—Wyndham's consumer affairs department determined that Wyndham was in error but did not update the Mainframe system for more than a month. During Wyndham's procrastination, Ms. Barber verified the inaccurate information as accurate. She did this because she does not have access to any of the information that would have resulted in the correct response. Had Ms. Barber been able to conduct the same investigation that the consumer affairs department conducted, she could have concluded in her first investigation that the credit reporting was inaccurate. She could not because Wyndham denies her access to the tools and information to conduct a reasonable investigation. Therefore, Wyndham ran a risk of harm to Plaintiff substantially greater than mere carelessness.

## VI.   CONCLUSION

"Furnishers are responsible for determining whether to report that a consumer is liable for a debt . . . ." (Mot. at 9). As Wyndham's expert has previously testified:

> Due to their ability to directly affect consumers' credit scores, credit reports and credit reputation, lenders entrusted by the credit reporting agencies with the ability to add, alter, or change consumer credit information appearing on their credit reports *should be held to the highest standard of care in protecting and maintaining the accuracy and integrity of such credit information.*

(Ex. 35 ¶ 8) (emphasis added).

Contrary to Wyndham's statement that furnishers are responsible for determining liability, and Wyndham's expert's opinion that furnishers should be held to the highest standards in investigating credit disputes, Wyndham claims that this case is a legal dispute that is beyond the purview of Section 1681s-2(b).  It is not.  As a matter of fact, the Original Contract was rescinded, no repossession occurred, and Wyndham's failure to investigate and delete the inaccurate credit reporting violated 15 U.S.C. § 1681s-2(b).   Wyndham's failure to conduct a reasonable investigation and delete the inaccurate information caused Plaintiff to suffer significant emotional distress that was so significant that he applied to move out of the country.  Wyndham has not met the standards of its own expert in myriad ways, and is not entitled to judgment as a matter of law.

Dated: August 18, 2021

Respectfully submitted,

Vedra Law LLC

/s/ Daniel J. Vedra
Daniel J. Vedra
**Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on the date first written above the foregoing was served CM/ECF on all parties of record.

/s/ Daniel J. Vedra
Daniel J. Vedra